*In re* INFORME DE LA COMISIÓN ASESORA DEL JUEZ PRESIDENTE SOBRE LA ESTRUCTURA Y FUNCIONAMIENTO DEL TRIBUNAL DE PRIMERA INSTANCIA.

*Número:* _____     *Resuelto:* 26 de junio de 1987

## RESOLUCIÓN

Examinado el Informe de la Comisión Asesora del Juez Presidente sobre la Estructura y Funcionamiento del Tribunal de Primera Instancia y considerando la naturaleza y el alcance de las recomendaciones, se crea un Comité Especial para estudiar a fondo dicho documento, realizar los estudios adicionales correspondientes, obtener las observaciones y sugerencias de los sectores interesados y someter al Tribunal el resultado de su encomienda.

El Comité Especial estará integrado por el Juez Presidente Señor Víctor M. Pons Núñez, quien lo presidirá, y los Jueces Asociados Señores Francisco Rebollo López y Peter Ortiz.

Se instruye al Secretariado de la Conferencia Judicial y a la Oficina de Administración de los Tribunales que

provean al Comité Especial los recursos y la información necesaria para realizar su trabajo.

En consideración a la naturaleza de las recomendaciones del Informe y para viabilizar la encomienda de obtener las observaciones de los sectores interesados, el Tribunal ordena su publicación conjuntamente con el voto explicativo preliminar y esta Resolución. Se instruye a la Oficina de Administración de los Tribunales que coordine con el Colegio de Abogados la publicación aquí dispuesta.

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió un voto explicativo preliminar.

(*Fdo.*) Bruno Cortés Trigo
*Secretario General*

—O—

Voto explicativo preliminar del Juez Asociado Señor Negrón García.

Mediante Resolución aprobada el 1ro de abril de 1987, el Tribunal consideró sometido para evaluación, análisis y acción institucional el Informe de la Comisión Asesora del Juez Presidente sobre la Estructura y Funcionamiento del Tribunal de Primera Instancia.

Estamos conformes con el Comité Especial creado hoy por resolución para evaluar las recomendaciones de dicho informe. Sin prejuzgarlas, nos preocupa la validez constitucional y practicabilidad de algunas de tales recomendaciones. Optamos por exponerlas, pues nuestro silencio podría malinterpretarse y dar lugar a la infundada sospecha de que estamos ajenos e insensibles al momento en que vivimos. Con la nueva, casi completa renovación del Tribunal Supremo, recién comenzamos otro ciclo más administrativo y doctrinario en la historia del Poder

Judicial puertorriqueño. Junto a los demás Jueces Asociados de este foro tenemos la obligación de coadyuvar al Juez Presidente en el buen funcionamiento de los tribunales, sin gestos heroicos, terapias radicales, ni esfuerzos costosos. Al evaluar el Informe de la Comisión Asesora del Juez Presidente recordamos el consejo cautelar de un estudioso del tema, a saber, que "debido a que el campo de [la administración judicial] está tan densamente influido por abogados —que por entrenamiento son defensores— tradicionalmente las propuestas de reformas han tenido mucho más de apología que de evaluación". (Traducción nuestra.) R. Wheeler, *Judicial Reform: Basic Issues and References*, 8 Policy Studies J. 134, 135 (1979).

Conscientes de ese señalamiento, abordamos la tarea partiendo de la premisa de que la "crítica seria y constructiva debe ser estímulo para la superación más que motivo de contrariedad o queja. Como uno de los poderes de la democracia, el Poder Judicial ha de mejorar la calidad de la obra con la discusión libre y franca de sus problemas". Memorias de la Primera Sesión Plenaria de la Conferencia Judicial de P.R., 1958, pág. 3.

A todas luces el método seguido en el Informe de la Comisión Asesora del Juez Presidente es eminentemente descriptivo. Salvo contadas excepciones, ha consistido en recopilar y hacerse eco de innumerables estudios y propuestas ya archivados hace algún tiempo y recientemente.[1] Contiene moderada y limitadamente algunos datos

---

[1] Informe del Comité para el Estudio y la Evaluación del Sistema Judicial, abril de 1965; Informe de la Comisión para el Estudio de los Tribunales del Consejo sobre la Reforma de la Justicia en Puerto Rico, enero de 1974, Vol. I; La Judicatura Puertorriqueña, Secretariado de la Conferencia Judicial, 1981; El Manejo de los Casos en el Tribunal de Primera Instancia, Informe sometido por la Oficina de Administración de los Tribunales a la Novena Sesión Extraordinaria, diciembre de 1982; Informe del Comité de Normas y Objetivos para Acelerar el Trámite

estadísticos para apoyarlas. Existen áreas importantes que no se cubren. No hay análisis empírico de las verdaderas y distintas causas de los problemas principales de suspensiones, congestión y atrasos que persisten tanto en lo civil, y marcadamente visible en el procesamiento de casos en lo criminal.

Una laguna significativa e incomprensible es que el Informe de la Comisión Asesora del Juez Presidente no tome en cuenta la dinámica actual y problemas del Tribunal Supremo de Puerto Rico. Se recomienda privar a este foro de una serie de casos y asuntos, sin examinarse precisamente a fondo nuestra labor, participantes, fallas, factores relevantes, proyecciones y posibles soluciones. La visión del tribunal intermedio de apelaciones no está avalada en la experiencia que genera un tribunal colegiado. En este sentido es debatible su valor persuasivo para propulsar enmiendas a la Ley de la Judicatura. Aun así, en la medida en que plantea nuevamente ciertos aspectos importantes en el sistema judicial y contiene algunas valiosas sugerencias,[2] el Informe de la Comisión Asesora del Juez Presidente es un buen punto de partida para una discusión seria. La dificultad es que, aparentemente, muchas de sus recomendaciones sólo pueden realizarse bajo un esquema constitu-

---

de los Casos en el Tribunal Superior, 1984; Inmunidad y Evaluación Judicial, Secretariado de la Conferencia Judicial, 1985, y Reorganización del Tribunal de Primera Instancia, Oficina de Administración de los Tribunales, 1985.

[2] De entrada —por adelantar el principio de independencia judicial— endosamos las propuestas referentes a eliminar los magistrados honorarios, y que sólo se designen como Jueces Especiales a abogados que se hayan desvinculado totalmente de la práctica privada. Informe de la Comisión Asesora del Juez Presidente sobre la Estructura y Funcionamiento del Tribunal de Primera Instancia, pág. 6.

Aunque no forma parte de las recomendaciones del Informe de la Comisión Asesora del Juez Presidente, debe explorarse si en el ámbito constitucional (Secs. 8 y 10, Art. V de la Constitución de Puerto Rico) es conflictiva la enmienda a la Ley de la Judicatura que actualmente autoriza la designación por el Tribunal Supremo de jueces que han alcanzado la edad de 70 años de retiro "obligatorio".

cional distinto al que rige al presente, mediante referéndum de enmienda constitucional, o a través de una nueva Convención Constituyente.

## I

*Consideraciones preliminares*

Cuando hablamos de reforma judicial —a modo de rescate del anaquel bibliotecario— vale la pena reproducir el siguiente lenguaje definitorio de su naturaleza multidimensional:

Por propia naturaleza, la administración de justicia no es gestión fácil. La variedad y complejidad de sus problemas dificultan el diseño de soluciones simples, económicas y rápidas.

Los estudios realizados al efecto, evidencian la concurrencia de múltiples factores que intervienen, contribuyen y propician los problemas del Poder Judicial:

1. Desde el punto de vista administrativo, no obstante las medidas adoptadas al efecto, el sistema de tribunales constituye una organización compleja de administrar al compararla con otras agencias gubernamentales o empresas de negocio ordinarias. Las razones básicas de esto se pueden sintetizar:

a. Las personas claves en los Tribunales —jueces y abogados— son profesionales de alto nivel que de ordinario están acostumbrados a trabajar de manera individual y generalmente rechazan los regímenes de disciplina y organización.

b. La independencia judicial abarca no sólo la libertad de criterio y conciencia judicial, sino de tipo administrativo.

c. Muchos de los protagonistas principales en el drama judicial —incluyendo los abogados en la práctica privada, jurados, testigos, acusados y litigantes— no son empleados públicos ni pertenecen al Poder Judicial.

d. Los múltiples participantes de la litigación muchas veces tienen distintos y contrarios objetivos. En ocasiones una parte y su abogado desean ventilar la controversia lo más

rápidamente posible, mientras que la parte contraria realiza todo esfuerzo por dilatar el trámite. Ello es de mayor predominio en el área de lo criminal, donde por razones de estrategia y otros motivos, los acusados intentan controlar las fechas de las vistas de los casos, sin considerar las consecuencias sobre los testigos y el Tribunal.

2. El ámbito de acción y muchas de las materias de los tribunales es determinado por los Poderes Legislativo y Ejecutivo y no es controlado por la Rama Judicial. En la mayoría de las ocasiones la aprobación de nuevas leyes tiene un impacto inmediato sobre los tribunales, sin que haya habido previa coordinación y proyecciones al efecto. Las soluciones, facilidades físicas y nuevos jueces, etc., regularmente son tardías e insuficientes.

3. La Rama Judicial no es económicamente autosuficiente sino que depende de las otras ramas de gobierno para solventar sus gastos y operaciones. Hasta recientemente, [1973] su presupuesto y reclutamiento del personal estaba sujeto al control directo y a las normas del Ejecutivo. (Escolios omitidos.) Informe de la Comisión para el Estudio de los Tribunales del Consejo sobre la Reforma de la Justicia en Puerto Rico, enero de 1974, Vol. I, págs. 5-7.

Es en virtud de este marco conceptual que la meta de toda reforma judicial debe inspirarse en lograr que: "(1) [l]a estructura judicial del país ... propici[e] que los tribunales puedan responder rápida y eficientemente a la evolución constante que experimenta la sociedad puertorriqueña. Cualquier cambio debe garantizar que los asuntos y controversias a ser dilucidad[os] sean resueltos de manera justa, rápida y económica; (2) [l]a administración de la justicia no es materia ni asunto de la exclusiva competencia de jueces y abogados, sino que es beneficio de la ciudadanía, del público y el pueblo en general. Las actitudes de los jueces y abogados deben reorientarse en diversas áreas para que el sistema logre mayor eficiencia; (3) [d]eben proveerse los medios para que la Rama Judicial sea autónoma e independiente, libre de las presiones indebidas. El concepto

de independencia judicial implica libertad de conciencia y discernimiento para emitir un fallo y resolver controversias, pero no representa abstracción ni aislamiento de las realidades externas contemporáneas existentes en Puerto Rico; (4) [t]oda norma procesal debe estar orientada a imprimirle mayor rapidez a los procedimientos, salvaguardando los derechos básicos de los acusados y partes. Para ello es necesario [implantar] enfoques radicales en algunos de los aspectos [en] que hasta el presente las soluciones ofrecidas en el pasado han fracasado. Se imponen medidas radicales que permitan variar actitudes, descongestionar los tribunales y que el sistema de justicia funcione adecuadamente; (5) [l]a Rama Judicial debe ser dotada de las técnicas avanzadas más modernas a los fines de aligerar los asuntos judiciales. La adaptación de la tecnología electrónica a las necesidades de los tribunales es imperativa[, y] (6) [d]ebe diseñarse un procedimiento rápido, económico y eficaz que facilite a la ciudadanía dirimir eficientemente los conflictos y controversias de mayor incidencia en el área civil, con o sin la participación de abogados, y las costas y gastos que ello representa." (Escolios omitidos.) Informe del Consejo sobre la Reforma, *op. cit.*, págs. 7–9.

Teniendo presente este ámbito conceptual y curso de acción examinemos los antecedentes del problema en sus dos modalidades endémicas, a saber, congestión y atrasos:

Para el año 1924 el entonces Juez Presidente, don Emilio del Toro, describió el siguiente panorama en Puerto Rico:

"Existe un clamor justificado en muchas ocasiones contra la dilación en la administración de la justicia en nuestro país, tanto en las causas criminales como en los pleitos civiles. Esta corte se ha visto obligada a decretar el sobreseimiento de muchas acusaciones por no haberse sometido a juicio a los acusados dentro del término de ciento veinte días. *Pueblo* v. *Arrocho*, 33 D.P.R. 657, 672 (1924)."

Más de medio siglo después, para el año 1978, el actual Juez Presidente, don José Trías Monge —sobre la tónica de

inercia procesal y la petrificación de instituciones— escribía: "[e]l abarrotamiento de los calendarios judiciales en Puerto Rico debe ser motivo de alarma".

Que la justicia en Puerto Rico es lenta, es una verdad inconcusa de ayer y hoy. Que la duración de los procesos ha llegado al extremo de que al cabo de un número irrazonable de meses o transcurridos los años es que se alcanzará una solución, en cuyo momento tal vez no remedie nada, es de conocimiento popular. Que los casos criminales [y civiles] languidecen en los tribunales, es incontrovertible. Que los esfuerzos, laboriosidad y devoción de la dirección de los tribunales, jueces y el personal parajudicial del pasado y presente no han podido evitarlo, es un hecho notorio.

*Si bien carecemos de fórmulas mágicas para abordar el problema, estamos convencidos de que la investigación de manera integral es necesaria. El procedimiento penal [y civil] exige un sistemático análisis sobre una gama de factores, con visión unitaria de los sujetos, objetos y actos que componen su dinámica.* Y sobre todo, estos diversos elementos deben ser examinados en funcionamiento, sobre la marcha, anotando y observando cómo se combinan los diversos elementos estructurales y las actividades y comportamiento de los participantes. (Énfasis suplido y escolio omitido.) *Pueblo* v. *Foster*, 110 D.P.R. 8, 9-10 (1980).

Con este espíritu —previa una rápida mirada a los antecedentes constitucionales— dirijimos nuestra atención a las recomendaciones más sobresalientes del Informe de la Comisión Asesora del Juez Presidente, a saber: (1) selección y nombramiento de los jueces a través de un Comité Asesor del Gobernador; (2) consolidación del Tribunal Superior y Tribunal de Distrito, y (3) Tribunal Intermedio de Apelaciones. Además, examinaremos aquellas otras propuestas de relativo impacto.

## II

### *Antecedentes constitucionales*

Bajo la rúbrica de Poder Judicial, el Art. V de nuestra Constitución estableció las reglas fundamentales de la

arquitectura orgánica de los tribunales. Sobre estos foros la Asamblea Constituyente "depositó y encomendó el salvaguardar comunitariamente 'el respeto a los derechos contra cualquier intervención contraria a esos derechos por el Poder Ejecutivo o Legislativo, solucionar los conflictos entre lo privado y público y adjudicar las controversias entre los individuos'. Para impl[an]tar y lograr una máxima eficiencia, estimó necesaria la mayor independencia de la Rama Judicial, proveyendo en su Art. V las siguientes características en medidas y prerrogativas: (a) la unificación del sistema judicial en lo concerniente a jurisdicción, funcionamiento y administración; (b) la estabilidad en los términos de cargos de los jueces y prohibición en la reducción de tales términos; (c) la adopción por el Tribunal Supremo de reglas de procedimiento civil, criminal y de evidencia; (d) la garantía contra la disminución de la compensación de los jueces; (e) el mandato de la Asamblea Legislativa de establecer 'un sistema de retiro para los jueces', obligatorio a los setenta (70) años; (f) el traslado a la Rama Judicial del poder de destitución o separación de jueces de instancia; (g) la prohibición de participar los jueces durante la incumbencia del cargo en actividades políticas u optar a puestos directivos en los partidos[,] y (h) estabilidad en la composición numérica de jueces del Tribunal Supremo, salvo cambio a petición de éste". (Escolio omitido.) *Negrón Soto* v. *Gobernador*, 110 D.P.R. 664, 666 (1981).

En acatamiento de las Secs. 1 y 2 del Art. V de la Constitución,[3] la Asamblea Legislativa aprobó la Ley Núm.

---

[3] Respectivamente disponen:

"*El Poder Judicial de Puerto Rico se ejercerá por un Tribunal Supremo, y por aquellos otros tribunales que se establezcan por ley.*"

. . . . . . . .

"Los tribunales de Puerto Rico constituirán un sistema judicial unificado en lo concerniente a jurisdicción, funcionamiento y administración. La Asamblea

11 de 24 de julio de 1952, conocida como Ley de la Judicatura. 4 L.P.R.A. sec. 1 *et seq.* Mediante este estatuto habilitador Puerto Rico se constituyó en un solo distrito judicial y estableció un sistema judicial unificado en lo concerniente a jurisdicción, funcionamiento y administración compuesto por el Tribunal Supremo —como tribunal de última instancia— y por un Tribunal de Primera Instancia. Ambos quedaron nominalmente refrendados como el Tribunal General de Justicia. El Tribunal de Primera Instancia, como tribunal de jurisdicción original, se dividió en dos secciones —Tribunal Superior y de Distrito— con determinada jurisdicción y competencia, tanto territorial como por razón de las materias y cuantías envueltas.

## III

*Método de selección y nombramiento de jueces*

La Comisión Asesora del Juez Presidente recomienda legislación creadora de Comité Asesor del Gobernador para la selección de los jueces. La importancia del elemento humano en el éxito de toda institución no se discute. En lo que toca al funcionamiento de los tribunales, es imposible acercarnos al ideal de la justicia y máxima eficiencia si los llamados a impartirla no representan los más altos niveles de excelencia, dedicación y talento. Al examinar los Cánones de Ética Judicial aprobados por este Tribunal el 1 de septiembre de 1977, como modelo inspirador aflora el juez que posee las características generales de laboriosidad, prudencia, serenidad, criterio independiente, imparcialidad, ecuanimidad, buenos hábitos de estudio y diligencia

---

Legislativa, en cuanto no resulte incompatible con esta Constitución, podrá crear y suprimir tribunales, *con excepción del Tribunal Supremo,* y determinará su competencia y organización." (Énfasis suplido.) Art. V, Secs. 1–2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 355.

en el esclarecimiento de la verdad. Estos atributos combinados con las dotes específicas de una personalidad discreta, solemne, circunspecta, paciente, cortés y en particular, considerada con sus compañeros jueces, abogados, litigantes y demás participantes, constituyen el inventario total de cualidades que debe poseer todo juez. Después de todo, es "axiomática una personalidad balanceada en todo miembro de la judicatura". *In re Rodríguez Vega*, 112 D.P.R. 264, 270 (1982).

Por la naturaleza variable del ser humano en el curso de su efímera existencia, hemos de aceptar que ningún método de selección de jueces es perfecto ni constituye garantía infalible contra la designación de personas no aptas. "La fluide[z] y cambios no controlables y anticipables que experimenta la naturaleza humana en cuanto a personalidad, actitudes de trabajo, conducta, estudio y grado de responsabilidad, difícilmente permiten lograr una proporción absoluta y total en cuanto a certeza y corrección de los nombramientos. No obstante, el criterio rector es que el sistema debe ser ... afirmativo y positivo que tienda [a] atraer a la judicatura regularmente el mejor talento jurídico." Informe del Consejo sobre la Reforma, *op. cit.*, pág. 111.

La lectura del Informe de la Comisión Asesora del Juez Presidente, *op. cit.*, págs. 13–15, referente a la necesidad de mejorar la calidad de los nombramientos judiciales acepta esta realidad y refleja una vez más la insatisfacción histórica, evaluada exhaustivamente en otros informes, con el sistema constitucional vigente. Ciertamente coincidimos en que se ha experimentado una erosión en los últimos años, atribuible quizás a una exacerbación y predominio, en grado antes no visto, del elemento partidista.

Sin embargo, no podemos olvidar que nuestro sistema actual de gobierno está concebido en una fórmula republicana tripartita. Se basa en la doctrina de "separación

de poderes" y "pesos y contrapesos". En su dinámica operacional, los partidos políticos constituyen los "grupos de opinión con derecho a proponer candidatos de su predilección", cuya existencia es de estirpe constitucional. *García Passalacqua* v. *Tribunal Electoral*, 105 D.P.R. 49, 69 (1976); *P.N.P.* v. *Tribunal Electoral*, 104 D.P.R. 741, 750–751 (1976); *Dávila* v. *Secretario de Estado*, 83 D.P.R. 186 (1960). "En nuestra democracia los partidos políticos son indispensables para su funcionamiento. Están investidos de poderes cuasi gubernamentales. Constituyen el vehículo de expresión colectiva ciudadana para canalizar pacíficamente las distintas tendencias políticas e intereses de los varios sectores de opinión del país. Como tales, formulan programas de administración y promueven candidatos a puestos políticos." *P.R.P.* v. *E.L.A.*, 115 D.P.R. 631, 638 (1984).

Desde esta perspectiva, expuesto a que se nos tache de heterodoxo o al riesgo de una malsana interpretación, no creemos posible aislar totalmente el elemento político-partidista en los nombramientos judiciales. No podemos olvidar que dicho esquema constitucional está afianzado en la hipótesis de la más balanceada distribución de poderes entre sus tres ramas —Ejecutiva, Legislativa y Judicial— como factor "saludable y necesario para mantener una verdadera democracia, evitando así una excesiva concentración en una de ellas con los peligros que ello conlleva". *Negrón Soto* v. *Gobernador*, supra, pág. 666. Precisamente, sobre el método constitucional prevaleciente, en este último caso afirmamos:

Independientemente de su sabiduría,([4]) pero formulado precisamente en la doctrina de frenos y contrapesos antes expuesta, la Asamblea Constituyente, previo extenso debate, optó por disponer que los "jueces [fueran] nombrados por el Gobernador con el consejo y consentimiento del Senado ... ", y que sus términos fueran fijados por "ley". La Ley de la Judicatura proveyó el término de doce y ocho años para los

jueces Superiores y de Distrito, respectivamente. 4 L.P.R.A. secs. 92 y 152. *Negrón Soto* v. *Gobernador*, supra, pág. 668.

Y al escolio cuatro (4) expusimos:

El peligro de concentrar demasiado poder en una rama de gobierno es evidente. La designación y nombramiento de los jueces exclusivamente por el Poder Judicial, sin la intervención de los otros Poderes, como se ha sugerido, podría crear una "hegemonía de magistrados" o "magistrarcado", con personas que se renovarían automáticamente sin estar sujetas al escrutinio de funcionarios electos en comicios periódicos. Por otro lado, "[e]s incuestionable que mientras mayor sea el término de duración de un juez en su cargo, menos intervenciones ajenas habrá que afecten la imparcialidad e independencia judicial que debe permear y caracterizar un sistema judicial. La estabilidad que tales términos imprimen y la ausencia de las presiones psicológicas que la renovación del término de juez conlleva, son fundamentos suficientes para favorecer tal enfoque.

"No obstante, preciso es ponderar que ciertos períodos muy extensos y los cargos [de], por vida —sin el diseño de mecanismos apropiados que permitan la revisión y evaluación de los incumbentes, y su separación del servicio por causas no autorizadas al presente— puede[n] propiciar que se mantengan en sus cargos personas incompetentes o cuyo estado físico o mental le[s incapacite] para continuar en el mismo. Cualquier recomendación debe contemplar el establecimiento de la carrera judicial, un balance razonable entre términos extensos, que en el proceso de renominación de un juez no intervengan consideraciones político-partidistas, y la creación de mecanismos adicionales de separación del cargo por causas justificadas." *Informe sometido al Consejo sobre la Reforma de la Justicia en Puerto Rico por la Comisión para el Estudio de los Tribunales*, 1974, págs. 108–109. *Negrón Soto* v. *Gobernador*, supra, pág. 668, n. 4.

Esta realidad no debe nublar nuestra óptica. El elemento político-partidista per se no es perjudicial si la persona seleccionada es idónea, está capacitada y posee al nivel deseado las cualidades de buen juez antes expuestas. El

pasado y presente dan lustre y prestigio a la judicatura personas que ingresaron directamente a la Rama Judicial desde los ambientes de la Asamblea Legislativa y el Ejecutivo, y desempeñaron imparcialmente y con ecuanimidad sus cargos. Aun así, con miras a asegurar al máximo que los aspirantes a la judicatura posean los atributos necesarios, en principio es meritoria la recomendación de la Comisión Asesora del Juez Presidente de que "[d]ebe aprobarse legislación que permita que los nombramientos judiciales se hagan por el Gobernador a base de unas listas de candidatos previamente seleccionados por sus méritos por un Comité Asesor, designado por el Gobernador, de composición mixta, donde estén representados los ciudadanos, los abogados, la judicatura y profesores de derecho". Informe de la Comisión Asesora del Juez Presidente, *op. cit.*, pág. 5. El mecanismo propuesto de un organismo asesor del Gobernador data desde hace varios años.

Sin embargo, en la medida en que estatutariamente se intenta imponer al Primer Ejecutivo el Comité Asesor, se ha argumentado que se estaría limitando su amplio poder de nombramiento según dispuesto en la Constitución. ¿Es posible tal restricción? El vocablo *asesorar*, en su tercera acepción, implica "tomar consejo una persona de otra, o ilustrarse con su parecer". *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. I, pág. 138. Sabemos que el único asesoramiento visualizado en la Constitución es el dimanante vía consejo y consentimiento del Senado. Esta mecánica constitucional de poderes divididos entre el Ejecutivo y el Senado explica por qué, hasta el presente, todos los comités asesores bajo los Gobernadores, Sres. Roberto Sánchez Vilella (1965–1968), Luis A. Ferré (1969–1972), Rafael Hernández Colón (1973–1976); Carlos Romero Barceló (1977–1984) y Rafael Hernández Colón (1985 al presente), han funcionado esencialmente sobre unas bases estrictamente voluntarias.

Bajo las actuales coordenadas constitucionales, ¿podría ser de otro modo? Ante estas interrogantes, es debatible por no decir dudoso, que una Asamblea Legislativa pueda por ley compeler a un futuro gobernador a compartir una prerrogativa que sólo viene obligado a hacerlo con el Senado. Como corolario, tampoco ninguna legislación podría condicionar a un gobernador de su libertad de retener o sustituir los miembros de ese Comité Asesor. Esta última circunstancia inyectaría el elemento de falta de continuidad en su composición. Además, después de cada elección se produciría el mismo fenómeno político-partidista de cambio que acontece a nivel de miembros del Gabinete, otros puestos jerárquicos y de confianza en diversas agencias y comisiones. Lógica y razonablemente cualquier gobernador habrá de desear que sus asesores sean personas de su confianza o comunión con los delineamientos ideológicos de su programa de administración.

En reconocimiento de esta realidad constitucional, en un equilibrio de los intereses comprendidos y tomando como punto de partida las pautas históricas y el caudal de experiencias, el Informe de la Comisión para el Estudio de los Tribunales del Consejo sobre la Reforma de la Justicia —recomendó como única opción posible— que se "elev[ara] a rango constitucional el Comité Asesor, y mediante legislación suple[mentaria]" se reconociera la autoridad nominadora del Primer Ejecutivo y la facultad de confirmación o rechazo del Senado.[4] Informe del Consejo sobre la Reforma, *supra*, pág. 123.

---

[4] Junto a esta recomendación de elevar a rango constitucional el Comité Asesor de Nombramientos Judiciales, la Comisión para el Estudio de los Tribunales del Consejo sobre la Reforma de la Justicia, instó la aprobación de legislación supletoria, encuadrada en los siguientes principios:

"(a) No sustituir la autoridad nominadora del Primer Ejecutivo, ni la facultad y trámite de confirmación o rechazo del Senado en nombramientos judiciales.

Ante la incógnita que constitucionalmente representa la legislación específica propuesta en el Informe de la Comisión Asesora del Juez Presidente no podemos endosarla.

## IV

*Consolidación*

La Comisión Asesora del Juez Presidente fundada en unos planteamientos efectuados por dos ex Jueces Presidentes, Luis Negrón Fernández (1969) (1972) y José Trías Monge (1978), en una norma propuesta en el 1974 por

---

"(b) La fórmula de recomendar y someter una lista de candidatos debe ser lo suficientemente amplia para que permita el ejercicio de la sana discreción del Primer Ejecutivo dentro de un margen numérico de candidatos. Por vía de ejemplo, el Gobernador recibiría tres (3) o cinco (5) candidatos y estaría limitado a nombrar uno de los sometidos.

"(c) La composición del Comité no debe responder a criterios político-partidistas, sino a las siguientes normas: Representación de los diversos sectores concediendo [*sic*] participación efectiva al Poder Judicial (Juez Asociado del Tribunal Supremo, Superior, Distrito y Juez Municipal); al Colegio de Abogados a través de miembros de la profesión legal (abogados activos en la práctica privada —civil y criminal— en el servicio público —fiscales—, y en el campo de la enseñanza del Derecho); y al sector ciudadano (profesional, obrero, etc.).

"(d) El Comité debe estar presidido por un miembro de la Judicatura y su ámbito de acción debe comprender la evaluación, investigación y recomendaciones de todos los jueces de Primera Instancia —Superior, Distrito y Municipal— ya sean de nuevo nombramiento o renominación. Debe estudiarse si el ámbito debe comprender la designación de los jueces del Tribunal Supremo.

"(e) Los nombramientos de los miembros del Comité por el Primer Ejecutivo deben ser términos fijos escalonados para asegurar la continuidad del cuerpo y su renovación periódica.

"(f) Los criterios y estándares del Comité en la selección de candidatos deben ser públicos y [deben] propiciar el establecimiento de la carrera judicial con ascenso en base al mérito.

"[(g)] El Comité debe establecer comunicaciones oficiales con el Juez Presidente del Tribunal Supremo a los fines de coordinar —en base a las necesidades de la Rama Judicial— la evaluación y recomendación de jueces para ciertos tribunales que requieren conocimientos y temperamentos especiales o algunas áreas geográficas de difícil reclutamiento.

"(h) Debe[n] proveerse facilidades mínimas de local, equipo y personal de tipo oficinesco e investigativo separadas de las correspondientes al Departamento de Justicia mediante asignación específica presupuestaria." Informe del Consejo sobre la Reforma, *supra*, págs. 123–125.

la Asociación Americana de Abogados (A.B.A.), y en su interpretación de la trayectoria histórica de la Ley de la Judicatura, recomienda:

15. Deben consolidarse las dos secciones del Tribunal de Primera Instancia —el Tribunal Superior y el Tribunal de Distrito— en una sección única del Tribunal de Primera Instancia. Todos los jueces de los actuales Tribunales Superior y de Distrito, independientemente del término de nombramiento, se designarán Jueces de Primera Instancia.

16. No deben designarse más jueces municipales. Los ya designados continuarán ejerciendo su cargo hasta el vencimiento del término de sus nombramientos, cuando podrán ser considerados para nombramientos como jueces del Tribunal de Primera Instancia.

17. El Tribunal Supremo debe facultarse por ley para determinar las sedes del Tribunal de Primera Instancia, sujeto a aprobación por parte de la Legislatura, de manera que pueda utilizar en forma efectiva y eficiente los recursos de la Rama Judicial. Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 8–9.

Este enfoque está basado en que "el Tribunal Superior está sobrecargado en comparación con el Distrito y que la carga de trabajo no está distribuida entre los jueces del sistema en forma equitativa". Informe de la Comisión Asesora del Juez Presidente, *supra*, pág. 34. Se aduce que para solucionar estos problemas la Rama Judicial ha ensayado exitosamente en el pasado y presente, como medidas alternas: (a) la designación administrativa de Jueces Municipales y de Distrito para actuar como Jueces de Distrito y Superior, respectivamente; (b) constituir una vez por semana el Tribunal Superior en las salas del Tribunal de Distrito; (c) aumentar el número de oficiales jurídicos; (d) crear jueces especiales y magistrados honorarios, y (e) aumentar el número de jueces.

En abono de la consolidación, como beneficios se destacan "en la teoría norteamericana de la administración

judicial" los siguientes: (1) eliminación de barreras de competencia; (2) accesibilidad; (3) uso más efectivo de los recursos; (4) economías; (5) mayor prestigio de los jueces, y (6) mejoramiento en el desarrollo profesional y en la selección de los jueces. Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 43–47. Examinemos la cuestión con detenimiento.

Ciertamente, la primera reacción a la idea de la consolidación de las secciones del Tribunal Superior y de Distrito es convenir que la agrupación de recursos físicos y humanos —como principio rector en toda buena administración— generaría algunos de los beneficios antes descritos. Sin embargo, una vez profundicemos, vemos que en la práctica muy pocos serán sus logros. Por el contrario, demostraremos que la rigidez de la consolidación y el daño estructural que podría causarle a la organización y eficiencia del Poder Judicial es por largo tiempo irreversible. Ello unido al costo económico que representaría prudencialmente no justifican ni aconsejan el cambio.

A modo de paréntesis, es menester aclarar que la norma sobre organización de los tribunales recomendada en 1974 por la A.B.A. en que se basa el Informe de la Comisión Asesora del Juez Presidente —al filo de una década y media después, en 1987— no ha sido acogida por ningún estado de la Unión norteamericana. Solamente el Distrito de Columbia y Guam dividen su estructura judicial en un tribunal de instancia de jurisdicción general y otro de última instancia. Todos los demás sistemas estaduales(5) —

---

(5) El Decano Roscoe Pound, motor intelectual de la reforma surgida en este siglo en Estados Unidos, visualizaba un sistema judicial sencillo, estructuralmente análogo al nuestro vigente, a saber, "un tribunal superior de primera instancia de jurisdicción general para todos los casos, civiles y criminales, sobre el grado de causas pequeñas, ofensas menores y violaciones a ordenanzas municipales". R. Pound, *Organization of Courts*, Boston, Inst. of Judicial for the Nat. Conference of Judicial Councils, 1940, pág. 277.

en sus variadas formas, poseen y reconocen el enfoque tradicional de tribunales de jurisdicción limitada, de jurisdicción general y de última instancia. Ni siquiera New Jersey, jurisdicción precursora del sistema judicial unificado, ha borrado las distinciones jerárquicas de tribunales y jueces. *Want's, Federal-State Court Directory*, Washington, D.C., Want Pub. Co., 1987. Para todos los efectos prácticos, la concepción del esquema adjudicativo de instancia compuesto sólo de tribunales de jurisdicción general original pertenece al mundo teórico.

Más allá del ámbito de las ideas y de los tubos de ensayo del laboratorio judicial, expongamos por qué el concepto de consolidación es irrealista, económicamente poco viable, cuyas consecuencias verdaderas y méritos son más bien limitados al área de la adjudicación civil.

Primero, nos parece un tanto idealista la conclusión del Informe de la Comisión Asesora del Juez Presidente, *supra*, pág. 46.

> Al eliminar las barreras de competencia, la consolidación permite, en principio, que un juez vea todo tipo de caso. Esto enriquecerá la experiencia, el marco de referencià y los recursos intelectuales de los jueces. Con ello se conjurará además, la situación actual de jueces altamente capacitados que se sienten frustrados al ver limitadas sus oportunidades de desempeñar plenamente la función judicial o de entender en casos de naturaleza variada que interrumpan la rutina de ciertas áreas de la labor judicial.
>
> La existencia de una sola categoría de jueces que atienda todo tipo de casos se convierte en sí misma en un sistema selectivo que obliga a dar el máximo, al mismo tiempo que exige de la autoridad nominadora un mayor rigor en los nombramientos.

Tal y como expuso en su comparecencia escrita ante la Comisión el ex Juez Asociado de este Tribunal, Lic. Raúl Serrano Geyls:

El problema de consolidación de tribunales es tal vez el más difícil de los planteados en este primer tema. Considero que el sistema actual ha creado valiosas tradiciones y prácticas que, salvo argumentos concluyentes en su contra que no conozco, le sirven de sólido fundamento. Permite, además, que en Puerto Rico pueda existir una carrera judicial de dos pasos que se inicia en el Tribunal de Distrito y termina en el Tribunal Superior, y que culmina, en muy contados casos, en el Tribunal Supremo. Esta clasificación jerárquica, con sus diferencias en los sueldos, importancia de los asuntos a juzgar, prestigio en la profesión y la comunidad y oportunidad, aunque pequeña, de llegar al Tribunal Supremo, tiene necesariamente que ser un gran atractivo para muchos candidatos a jueces (págs. 65–67). Añádase a ello, el gran aumento en los costos que ocasionaría consolidar ambos tribunales y las demás dificultades que describe el informe.

*En suma, no hay en el informe ni conozco argumentos de suficiente peso para sostener que debe eliminarse la estructura actual. Eso no significa que no deban hacerse esfuerzos para hacerla más flexible, más eficiente y más vigorosa.* (Énfasis nuestro.)

La Comisión Asesora del Juez Presidente aduce que con la consolidación se eliminarían las barreras de competencia, habría más accesibilidad, se usarían mejor los recursos, serían más económicos, le daría mayor prestigio al tribunal y lograría un mejoramiento en el desarrollo profesional y selección de jueces.

Sobre el particular notamos, que según el Informe de la Comisión Asesora del Juez Presidente, *supra*, pág. 52, la propuesta no afectaría "por consideraciones de índole práctica y económica ... las sedes del Tribunal de Primera Instancia que son actualmente cabeceras de distrito. Por ejemplo, los casos criminales graves. De este modo los cambios estructurales y los costos que requeriría el sistema de juicio por jurado en algunas sedes adicionales del [T]ribunal consolidado no se harán sentir de inmediato. Con ello se evitará, además, cualquier efecto adverso sobre la

fiscalía de distrito y sobre la Sociedad para la Asistencia Legal".

De lo anterior se desprende que los efectos serán en el ámbito de lo civil, pues se ignoran los posibles "costos y consecuencias administrativas de dotar a otras sedes del Tribunal consolidado de las instalaciones y recursos necesarios para atender los casos de delitos graves por jurado". Íd., pág. 52.

Aparte de desconocer el impacto presupuestario y cómo la consolidación afectaría el sistema de jurados para la adjudicación de causas criminales por delitos graves, la Comisión Asesora del Juez Presidente limita más sus consecuencias. Acepta además, que en la adjudicación de querellas bajo la Ley de Menores, "en el futuro inmediato los recursos especializados de procuradores de menores estarán disponibles sólo en las actuales cabeceras de distrito, por lo que allí deberán permanecer los asuntos de menores". Íd., pág. 52.

Ante estas serias limitaciones funcionales, ¿cuál es el verdadero significado de la consolidación? El mismo informe nos brinda la respuesta:

> ... [S]erán básicamente los casos civiles de la competencia del actual Tribunal Superior los que mediante la consolidación quedarán distribuidos entre todas las sedes del Tribunal de Primera Instancia consolidado. Los casos criminales graves y los asuntos de menores se podrán distribuir en más sedes en la medida en que lo permitan los recursos.
>
> En principio, los jueces del tribunal consolidado atenderán todo tipo de casos, incluyendo las investigaciones. La labor de investigación requiere que el plan de distribución geográfica y asignación de sedes que desarrolle la Oficina de Administración de Tribunales tome en consideración las necesidades de acceso a la sede de cada uno de los municipios que ésta comprenda. (Énfasis suplido.) Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 52–53.

Son evidentes, pues, los efectos restringidos de la consolidación. Con el limitado objetivo de una mejor distribución de tareas y hacer los tribunales más accesibles en el área de lo civil, se ha sacrificado el "principio elemental de jerarquía judicial". Ello representa uno de los mayores defectos que conlleva la consolidación: la creación de una sola categoría de Jueces de Primera Instancia. Para lograr esa unicidad ha sido menester proponer sueldos similares por razón de poseer las mismas prerrogativas judiciales. Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 54–55. A tal efecto, todos los jueces devengarían $48,000 anuales y el impacto presupuestario calculado sería de $800,000 en los Jueces de Distrito. Íd., pág. 76. No se necesita mucho esfuerzo mental para anticipar la impresionante acogida que este fascinante aumento salarial generará entre los Jueces de Distrito. Igual enfoque y reacción es de esperarse en cuanto al resto del personal auxiliar del Tribunal de Distrito. A éstos se les asignaría el sueldo correspondiente a la nueva categoría del puesto equivalente existente o a crearse en el Tribunal de Primera Instancia. El impacto fiscal anual estimado sería de $1,600,000 adicionales. Íd., pág. 76.

La anterior cifra, según el Informe de la Comisión Asesora del Juez Presidente, *supra*, pág. 77, no comprende el costo de proveer espacios adicionales para la conversión de salas del Tribunal de Primera Instancia. Tampoco toma en cuenta los efectos sobre el Sistema de Retiro de la Judicatura y el de los demás empleados de este inusitado "aumento salarial instantáneo". Ello sería un área a evaluarse separadamente y de manera macroscópica para incluir los efectos indirectos originados en reclamos económicos de igual trato, que razonablemente cabe esperar que surjan entre los Fiscales del Tribunal de Distrito y los abogados de las entidades dedicadas a la defensa gratuita a los pobres.

Pero hay más. La Comisión Asesora del Juez Presidente "recomienda que las funciones judiciales del Tribunal Municipal se integren a las del Tribunal de Primera Instancia. Desde esta perspectiva, [nos aduce que] la totalidad del presupuesto que ahora se destina a este Tribunal —poco más de $3 millones en el año fiscal 1986-87— desaparecería como gasto de la Rama Judicial". Íd., pág. 78.

Inquieta esta conclusión. Preguntamos, ¿cómo lograr estas economías? ¿Quién realizará la labor de estos Jueces Municipales? En algún momento, ciertamente alguien tendrá que suplantarlos y prestar los servicios mínimos "judiciales" a la ciudadanía requeridos por las leyes en las distintas municipalidades tales como determinación de causa probable, etc. Por impráctica y poco económica, no puede ser solución sustituir "la función social y de orientación que hoy desempeñan los jueces municipales[,] ... que se amplíe el personal —abogados y trabajadores sociales entre otros— que provean ese servicio en los municipios y en las oficinas del Programa de Derechos de Familia que existen en las actuales sedes del Tribunal Superior". Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 51-52.

Aparte del sentir de algunos Jueces Municipales de que las "orientaciones de carácter social a los ciudadanos ... les consume aproximadamente la mitad del tiempo que le dedican a su cargo, y no constituye un reto profesional ni los motiva" (íd., pág. 50), ¿qué otra justificación se aduce para privar al pueblo de esos servicios? ¿Cuál será el costo espiritual del cambio? Ante la crisis de autoridad y disminución de los valores comunitarios y controles sociales, ¿podrán abogados y trabajadores sociales inyectar el ingrediente eminentemente persuasivo que presupone la intervención de un juez y lograr el efecto deseado?

El esquema para reemplazar los Jueces Municipales merece un comentario ulterior. Al presente hay autorizados 102 puestos de Jueces Superiores y 96 de Distrito, para un total de 198 jueces. El Informe de la Comisión Asesora del Juez Presidente, *supra*, parte de la hipótesis, a juicio nuestro irrealista, de suponer que esos jueces —más dos adicionales que se proponen en la legislación (íd., pág. 9), según unos anteproyectos que se acompañan— podrán descargar, además de sus funciones normales, todas aquellas otras que ahora realizan coordinadamente los Jueces Municipales.

Con respeto al criterio ilustrado de la Comisión Asesora del Juez Presidente, la solución es equivocada. Las categorías de jueces son un elemento insustituible en toda organización judicial de diseño piramidal realmente pragmática y balanceada.

Aun en la jurisdicción federal —en que existe el esquema de un Tribunal General de Primera Instancia, las Cortes Intermedias de Apelaciones y el Tribunal Supremo— congresionalmente fue necesario crear la institución de "magistrado" para descargar, a título de representante directo del Juez de Distrito Federal, ciertas responsabilidades que no ameritan ser atendidas por estos últimos. Véanse: M. R. Krasno, *The Federal Magistrate System—Under New Scrutiny*, 67 Judicature 256–257 (1983); C. Seron, *The Role of Magistrates in Federal Courts*, Federal Judicial Center, dic. 1983, págs. 6–13; S. Puro, R. L. Goldman y A. M. Padawer-Singer, *The Envolving Role of U.S. Magistrates in the District Courts*, 64 Judicature 437–449 (1981); J. B. Streepy, *The Developing Role of the Magistrate in the Federal Courts*, 29 Clev. St. L. Rev. 81–96 (1980); J. Vincent Aug, Jr., *The Magistrate Act of 1979: From a Magistrate's Perspective*, 49 Univ. Cincinnati L. Rev. 363–376 (1980); P. G. McCabe, *The Federal Magistrate Act of 1979*, 16 Harv. J. on Legis. 343, 349 (1979).

Tomamos excepción de que el mayor prestigio de los miembros de la judicatura se logra con aumentar y equiparar los sueldos y prerrogativas. Al decir de Soto Nieto, "[s]iempre hemos antepuesto la autoridad ganada con prestigio a la que no tiene más sostén que las arquitecturas orgánicas". F. Soto Nieto, *Compromiso de Justicia*, Madrid, Ed. Montecorvo, 1977, pág. 60. El incremento de sueldos a toda una clase de profesionales no es garantía de mayor laboriosidad y dedicación. Sinceramente creemos que aquellos jueces que hoy día no rinden ni desempeñan satisfactoriamente sus funciones no van a comenzar a hacerlo mañana porque estén mejor remunerados y se les denomine Jueces del Tribunal de Primera Instancia. Las reacciones de seres humanos son más complejas.

La categoría de jueces es esencial. En lo penal, es imposible legislar y medir a través de una sola norma jurídica toda acción delictiva. Las clasificaciones de delitos —llámense graves, menos graves, o de otro modo— subsistirán. Alguien tendrá que adjudicar los casos de infracciones menores de tránsito y ordenanzas municipales. Otros jueces deberán ventilar los casos graves ante jurados. En lo civil, no podemos atribuirle las mismas consecuencias legales a las distintas omisiones o acciones de la conducta. Por ende, siempre será necesario que algún juez realice las funciones que al presente recaen sobre los Jueces Municipales y los Jueces de Distrito. Es inevitable la asignación más o menos permanente de jueces en las salas de investigaciones. También se requiere que muchos residan en ciertos municipios de la isla y atiendan los asuntos que surjan en éstos y en las demarcaciones territoriales colindantes. Aceptando que algunos Jueces Municipales se sientan frustrados porque profesionalmente sus responsabilidades no constituyen un reto, ¿puede afirmarse que integrando temporalmente a los Jueces Municipales al Tribunal de Primera Instancia —pero asignándoles las

mismas funciones por los próximos años— van a desaparecer tales sentimientos?

Honestamente no alcanzamos a ver cómo el costo de la conversión de Jueces Municipales a Jueces del Tribunal de Primera Instancia "se cubriría con las economías generadas con la recomendación relativa al Tribunal Municipal". Informe de la Comisión Asesora del Juez Presidente, *supra*, pág. 78. Tampoco cómo el sistema puede funcionar mejor creándose una sola categoría de jueces. A riesgo que se nos tache de escépticos, en la práctica, la fusión de las secciones del Tribunal Superior y de Distrito y la absorción de los Jueces Municipales al Tribunal de Primera Instancia, sólo tendrá para los de Distrito el atractivo del aumento de sus sueldos —equiparándolos a los restantes miembros de la judicatura— independientemente del desempeño real de sus prerrogativas judiciales.

Si la consecuencia del cambio propuesto fuera únicamente económica, quizás no habría tanto reparo. No es así. El mayor peligro de esta consolidación —generada por una combinación de sus efectos salariales y la recomendación de aumentar los términos del nuevo cargo de Juez del Tribunal de Primera Instancia a diez y seis (16) años— es que una vez se conviertan en ley habremos dado dos pasos irreversibles que contienen el agravante de que no son susceptibles de ser subsanados por estatuto, y *quaere* si en una Convención Constituyente.[6] Más aún, aunque sea así estatutoriamente organizado el Tribunal de Primera Instancia, habrá un "período de transición" en que los actuales Jueces de Distrito y Superior (incluso Jueces Municipales) serán designados administrativamente por el

---

[6] Precisamente la experiencia de la Asamblea Constituyente del 1952 llevó a reconocer que no podían disminuirse ni afectarse los términos de los incumbentes del Tribunal Supremo que gozaban de nombramientos vitalicios y los de los otros jueces cuyos términos no estaban vencidos. Sec. 3, Art. IX, Disposiciones Transitorias.

Juez Presidente para actuar como Jueces de Primera Instancia. Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 54–55. Si bien ese será el esquema legal, en la práctica la sustitución de estos jueces no se habrá completado ni culminado hasta casi mediados de la próxima década.[7]

La cuestión entraña potencialmente un riesgo sustancialmente mayor. De no funcionar eficientemente el esquema del Tribunal de Primera Instancia, según consolidado, ya sea durante esta etapa inconclusa o una vez culminada, ¿podría legislativamente remediarse la situación antes de la expiración de los cargos de los jueces así nombrados? ¿Sería constitucionalmente posible retornar a una división distinta de categorías judiciales antes de transcurrir diez y seis (16) años? Formulamos estas preguntas, pues nuestra Constitución, en su Sec. 13, Art. V y Sec. 11 del Art. VI, tajantemente prohíbe toda reducción de sueldos y en los términos de nombramientos de los jueces.

Más allá de este enigma constitucional, existen además otros aspectos, también sensibles, que deben ser ponderados. Se recomienda nutrir los tribunales apelativos de los Jueces de Primera Instancia y periódicamente rotarlos. Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 71–72. Aconsejamos cautela. "Una rápida expansión de la judicatura puede resultar en una disminución en la calidad de selección de los jueces. El expandir significativamente

---

[7] Años de Vencimiento del Término de 53 Jueces Municipales Actuales

| 1987 | 1988 | 1989 | | 1990 | 1991 | |
|------|------|------|--|------|------|--|
| 18 | 6 | 9 | | 16 | 4 | = 53 |
| 33 = 62.3% | | | | 20 = 37.7% | | |

Años de Vencimiento del Término de 95 Jueces de Distrito Actuales

| 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 |
|------|------|------|------|------|------|------|------|
| 23 | 5 | 4 | 17 | 10 | 12 | 12 | 8 |
| 32 = 33.68% | | | | 63 = 66.3% | | | |

el número de individuos seleccionados de una fuente relativamente constante conduce inevitablemente a elevar al estrado apelativo a ciertos individuos que de otro modo no habrían alcanzado esa posición. Si se supone que en un ambiente más competitivo la persona más 'idónea' habría sido seleccionada, habrá por lo menos entonces una disminución marcada en la calidad de los individuos seleccionados para ocupar nuevas vacantes en los estrados apelativos.

"Como segunda consideración, ligada a la primera, tenemos que la 'proliferación' de puestos judiciales puede resultar en 'una depreciación del valor corriente judicial', con la consecuente inhabilidad para atraer individuos de las más altas cualidades al estrado. Además, la expansión de jueces en una corte apelativa puede crear problemas institucionales que no existen a nivel de instancia. Mientras cada juez de instancia es una 'entidad decisoria autónoma', los jueces de apelación rinden sus decisiones colegiadamente. El esquema más estable, seguro y predecible sería el de una corte compuesta por jueces permanentemente asignados, todos los cuales intervinieran en cada apelación. Mientras más nos alejemos de ese modelo, mayor será el riesgo de corroer esas cualidades.

"El adicionar jueces aumenta la burocracia y disminuye la colegiación. La multiplicación de unidades judiciales decisorias mengua la uniformidad ... ". (Traducción nuestra y escolios omitidos.) R. L. Aynes, *Maintaining the Integrity of the Ohio Appellate System*, 16 Akron L. Rev. 115, 117–118 (1982).

Por último, en cuanto a la recomendación de que debe recaer en la Rama Judicial la determinación de crear, organizar y determinar las sedes de las Salas del Tribunal de Primera Instancia, hemos de aclarar que tal propuesta procede independientemente del destino final de la consolidación. Ahora bien, debería ser mediante enmienda

a nuestra Constitución en su Sec. 2, Art. V. La alternativa de que "la Legislatura, mediante ley al efecto, deleg[ue] su función, en los aspectos mencionados, al Juez Presidente y éste somet[a] los cambios necesarios a la aprobación o desaprobación de la Legislatura, siguiendo el mecanismo consagrado en el Artículo V, Sección 6, de la Constitución ... aunque es más factible, contiene la dificultad de que no existe certeza que ésta u otras legislaturas posteriores coincidan con este criterio". Informe del Consejo sobre la Reforma, *supra*, pág. 92.

## V

### Tribunal Intermedio de Apelaciones

En este aspecto el Informe de la Comisión Asesora del Juez Presidente adolece de fallas insubsanables. La más impactante es que, sin examinarse a fondo las causas y razones para que desde hace algún tiempo este Tribunal esté acumulando un número inusitado de casos, se intente podar su jurisdicción, se establezca "permanentemente" un tribunal intermedio —de múltiples salas— denominado División Apelativa, so pretexto de lograr que se instaure el derecho absoluto de apelación en casos civiles en desuso casi por treinta (30) años. El Informe de la Comisión Asesora del Juez Presidente, *supra*, no explora satisfactoriamente todas las dimensiones que presenta este aspecto. Todavía se desconoce el potencial real máximo de productividad de este Tribunal recién integrado. Antes de seleccionar la ruta de un tribunal intermedio apelativo se impone al respecto "un estudio abarcador y científico". Informe del Consejo sobre la Reforma, *supra*, pág. 82. Esto no se ha hecho. "Una reforma apelativa efectiva y significativa requerirá de las cortes un enfoque de perspectiva fresca a un viejo problema. Requerirá que las cortes apelativas realicen un autoexamen, que experimenten con una variedad de técnicas para redu-

cir atrasos, y evalúen rigurosamente las consecuencias de tales técnicas con las cuales han experimentado y estén preparados a abandonar enfoques inapropiados." (Traducción nuestra.) J. A. Martin y E. A. Prescott, *Appelate Court Delay, Structural Responses to the Problems of Volume and Delay*, Richmont, Va., Nat. Center for State Courts, 1981, XXI.

Para comprender el alcance y las consecuencias negativas de la recomendación sobre tribunal intermedio apelativo, es menester recordar, según antes indicado, que constitucionalmente el "Tribunal Supremo será el tribunal de última instancia en Puerto Rico". Art. V, Sec. 3, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 356. Este lenguaje nos provee de inmediato la característica esencial de foro máximo de jurisdicción apelativa, en contraste con los otros tribunales del país de jurisdicción original. A su vez destaca la nota singular del linaje constitucional del Tribunal Supremo frente a los otros que son producto de la Asamblea Legislativa.

La regla general de foro apelativo de este Tribunal sufre excepciones en "hábeas corpus y de aquellos otros recursos y causas que se determine por ley". Art. V, Sec. 5, Const. E.L.A., *supra*, pág. 357. Por último, aunque la Constitución mantiene silencio, el Tribunal Supremo —en el ejercicio de un poder inherente que ya no se discute— tiene la facultad de reglamentar, en sus distintos y variados aspectos, la profesión de abogado, incluso su admisión y remoción. *In re Añeses*, 117 D.P.R. 134 (1986); *In re Freytes Mont*, 117 D.P.R. 11 (1986); *In re Pagán Ayala*, 115 D.P.R. 814 (1984); *In re Liceaga*, 82 D.P.R. 252, 255 (1961); *In re Andréu Ribas*, 81 D.P.R. 90, 121 (1959); *In re Pagán*, 71 D.P.R. 761, 763 (1950); *In re Abella*, 67 D.P.R. 229, 238 (1947); *In re González Blanes*, 65 D.P.R. 381, 390–391 (1945); *In re Bosch*, 65 D.P.R. 248, 251 (1945); *In re Arroyo Rivera*, 63 D.P.R. 796, 798 (1944); *Guerrero* v. *Tribunal de Apelación*, 60 D.P.R. 241,

247-252 (1942); *Ex parte Jiménez,* 55 D.P.R. 54 (1939); *In re Tormes,* 30 D.P.R. 267, 268 (1922); *In re Díaz,* 16 D.P.R. 82, 92 (1910).

En lo concerniente a su jurisdicción apelativa, desde la aprobación de la Constitución en 1952 hasta el 1958, el Tribunal Supremo atendió, como cuestión de derecho, toda apelación civil y criminal. Mediante la Ley Núm. 115 de 26 de junio de 1958, las apelaciones civiles se convirtieron en recursos de revisión discrecionales. Los antecedentes de esta legislación tienen su origen en los planteamientos expuestos por el entonces Presidente de la Cámara de Representantes, Lic. Ernesto Ramos Antonini, en un discurso pronunciado el 13 de marzo de 1957 ante dicho cuerpo denominado "El Problema de Congestión y Demora en lo Judicial". A su vez, las soluciones que cuajaron en la Ley Núm. 115 fueron formuladas en virtud de un informe preparado por el Lic. José Trías Monge —en calidad de asesor *ad honorem* de la Comisión de lo Jurídico de la Cámara— que por su vigencia en lo pertinente reproducimos *in extenso:*

La jurisdicción del Tribunal Supremo.

El crecido volumen anual de radicaciones en el Tribunal Supremo denota claramente la necesidad de una reforma radical de su jurisdicción. Si es que deseamos lograr que cada decisión del Tribunal Supremo sea el producto del estudio personal de cada juez no es posible esperar que cada juez pueda estudiar adecuadamente y contribuir a la decisión de los setecientos casos que por lo común se presentan cada año ante nuestro Tribunal Supremo.

Uno de los métodos clásicos de descargar la labor de un tribunal de última instancia consiste en la creación de un *tribunal intermedio de apelaciones.* Diversas razones militan *contra* esta forma de intentar solucionar en Puerto Rico el actual problema de excesiva acumulación de casos en nuestro Tribunal Supremo: el *alto costo* envuelto, tanto para el erario público como para los litigantes; la casi certeza de *demorar*

aún más la decisión final de nuestras controversias; y la indeseabilidad de *crear una nueva jerarquía de jueces* en vez de mejorar las condiciones de trabajo y elevar al máximo el prestigio de los actuales cargos de juez superior y juez de distrito. La creación de un tribunal intermedio de apelaciones en Puerto Rico no correspondería, a mi juicio, a las particulares necesidades de nuestro medio. Nuestras circunstancias de vida, así como el general dinamismo de nuestra sociedad, exigen una organización sencilla de tribunales que facilite la pronta impartición de la justicia, en vez de una organización complicada, a cuatro niveles, en que la inversión en tiempo y dinero que se exigiría de los litigantes podría cerrar las puertas de nuestro tribunal de última instancia a buena parte de nuestra población.

. . . . . . . .

La creación de tribunales intermedios de apelación o de divisiones apelativas del tribunal de jurisdicción original general como medio de limitar la jurisdicción de un tribunal de última instancia *obedece normalmente al deseo de rendirle pleitesía al concepto de que cada litigante debe tener derecho a por lo menos una apelación.* Tal concepto, a mi juicio, no se funda en una base realista. Es simple *ficción* suponer que los intereses de los litigantes están mejor protegidos mediante el reconocimiento de un derecho a apelar ante un tribunal que tiene sus calendarios congestionados que mediante el establecimiento de su derecho a recurrir por vía de [*certiorari*] ante un tribunal de calendarios despejados. Independientemente del estado de los calendarios, además, es ficticio suponer que el recurso de apelación garantiza de por sí una revisión más cuidadosa que el recurso de [*certiorari*] o cualquier otro método de revisión que descanse en la discreción del Tribunal. *En ambos casos las partes tienen amplia oportunidad para presentar sus puntos de vista y convencer al Tribunal de los méritos de los mismos. Si el Tribunal no considera que el fallo cuya revisión se solicita es erróneo poco ha de importar el nombre que se le dé al recurso, si apelación o* [*certiorari*].

Considero, por lo tanto, que no hay objeción válida a que prefiramos en Puerto Rico el método más sencillo para mantener el calendario de nuestro más alto tribunal en condiciones adecuadas, que es simplemente convertir la

jurisdicción de nuestro Tribunal Supremo, con algunas excepciones importantes necesarias, de mandatoria en discrecional. Permanecería así igual la estructura de nuestras cortes y en vez de concentrar nuestros recursos en la creación de una nueva etapa apelativa intermedia utilizaríamos esos recursos en reforzar más bien nuestros tribunales de primera instancia, mejorando sus condiciones de trabajo y añadiendo a la dignidad de sus procesos.

En virtud de tal sistema, no procedería la apelación al Tribunal Supremo de las decisiones del Tribunal Superior, excepto en un número restringido de causas, aunque se podría acudir, por supuesto, a nuestro tribunal de última instancia en recurso de [*certiorari*] o recurso discrecional de revisión, lo que protegería adecuadamente, según hemos visto, los derechos de los litigantes. Como limitación a este principio podría reconocerse el derecho de apelación, si se estima necesario, en aquellos casos que envuelvan alguna cuestión constitucional sustancial y en casos criminales en que se hubiese dictado pena de reclusión perpetua.

.    .    .    .    .    .    .    .

El sistema propuesto le permite a un tribunal distinguir, con mayor precisión y justicia que a través de métodos formales como la designación de errores, entre las apelaciones frívolas y las que no lo son. Considero que en esta forma el Tribunal Supremo de Puerto Rico estaría en mejores condiciones para continuar sirviendo los dos fines básicos de un tribunal de última instancia: hacer justicia individual y sentar las normas jurídicas básicas que han de gobernar la vida de un país. (Énfasis suplido.) 10 Diario de Sesiones de la Asamblea Legislativa, T. 3, págs. 1565–1566 (1958).

Esta perspectiva histórica es válida al presente. No obstante, la Comisión Asesora del Juez Presidente pretende revertir al sistema de apelaciones civiles como cuestión de derecho, pero esta vez ante un tribunal apelativo intermedio de salas múltiples. En su apoyo, el informe aduce que ello es "una consecuencia lógica e inexorable de la consolidación" y "a la vez atiende una urgencia esencial social de justicia apelativa ... ". Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 57–58. A tal efecto nos dice:

... *Normalmente la justicia apelativa es colegiada.* Con la colegiación se aspira a propiciar la participación de distintas perspectivas económicas y sociales en el proceso decisional y a atenuar el impacto de las idiosincracias individuales y los efectos que puedan tener sobre una decisión el temperamento e incluso los prejuicios personales.

*Existe en la comunidad y en el foro la impresión de que con frecuencia los litigantes no tienen una oportunidad razonable de justicia apelativa.* La ausencia de ésta es una de las causas principales de la insatisfacción del pueblo con la administración de la justicia. Por excelente que sea la justicia que imparten los tribunales de instancia, el ciudadano no queda satisfecho cuando la decisión adversa es hija del criterio de un solo juez.

El ciudadano aspira a una oportunidad real de justicia apelativa ante un tribunal colegiado, no por la gracia de su discreción sino como cuestión de derecho. Cuando el ejercicio de la discreción es adverso a la parte que solicita la revisión *y no media suficiente explicación al respecto,* persiste la impresión de que el tribunal no consideró verdaderamente los méritos del caso y que la justicia no fue bien servida. *Se perciben críticas insistentes de los miembros del foro por el uso cada vez mayor del "no ha lugar".* El número de casos que el Tribunal Supremo adjudica de esta forma ha ido en aumento. En los años comprendidos entre 1974–75 y 1985–86, se dispuso del 58% de los recursos presentados mediante el "no ha lugar". Durante el año fiscal 1985–86, el porcentaje de estos recursos aumentó al 64%. (Énfasis suplido.) Íd., págs. 59–60.

En orden a esta visión, la Comisión Asesora del Juez Presidente propone legislación creadora de un tribunal intermedio apelativo permanente para entender en:

a. [L]os [*certiorari*], a ser librados a su discreción, contra resoluciones y órdenes del Tribunal de Primera Instancia[;] b. las apelaciones de las determinaciones de inexistencia de causa probable para acusar (vistas preliminares)[;] c. las apelaciones contra las decisiones, resoluciones y órdenes de todas las agencias administrativas[,] y d. las apelaciones

civiles y criminales originadas en el Tribunal de Primera Instancia.

El Tribunal Supremo y la División Apelativa tendrán una secretaría conjunta. Esta referirá a la División Apelativa: (1) los [*certiorari*] contra resoluciones y órdenes del Tribunal de Primera Instancia; (2) las apelaciones de determinaciones de inexistencia de causa probable para acusar (vista preliminar)[,] y (3) las apelaciones contra las decisiones, resoluciones y órdenes de todas las agencias administrativas. No obstante, en cualquiera de esos casos, si está envuelta una cuestión constitucional sustancial o un asunto de interés público fundamental, la División deberá remitir el expediente al Tribunal Supremo para que éste decida si el caso amerita que lo considere directamente o lo devuelva a la División.

El Tribunal Supremo tendrá siempre la facultad de ordenar que se le remita cualquier recurso ante la consideración de la División Apelativa para considerarlo directamente.

Con respecto a todos los demás recursos de apelación, el Tribunal Supremo revisará el calendario y seleccionará aquellos casos en que habrá de entender porque presenten cuestiones constitucionales sustanciales o sobre otras áreas de derecho que considere de trascendencia social, política y económica para el país. La División Apelativa entenderá en todos los demás casos y sus decisiones serán *finales e inapelables*.

19. La División Apelativa funcionará en salas o paneles de tres (3) jueces, los cuales se rotarán periódicamente. El Tribunal Supremo decidirá cualquier conflicto que pueda surgir entre los paneles. Las opiniones relevantes de la División Apelativa deberán publicarse. (Énfasis suplido.) Íd., págs. 9–10.

El costo operacional de esta División Apelativa ha sido conservadoramente calculado en el informe en un millón de dólares ($1,000,000) el primer año y en tres millones ochenta mil ciento veinticinco dólares ($3,080,125) posteriormente. Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 80–81.

Nos inquieta su validez constitucional. Además, tenemos serias objeciones a esta recomendación y al modelo organizacional y operacional. Expongámoslas.

A. *El tribunal intermedio propuesto y su constitucionalidad*

La Comisión Asesora del Juez Presidente, con el propósito de evitar el reconocido mal de la "doble apelación" que irremediablemente surge cuando se introduce el esquema de un foro intermedio, como regla general, recomienda que las decisiones de la División Apelativa sean "finales e inapelables". La propuesta podría llevar en sí el germen de inconstitucionalidad si se concluye que atenta contra el concepto fundamental establecido en la Constitución de que el Tribunal Supremo es el foro de "última instancia" del país. Según antes expuesto, este concepto en dos palabras compendia y proyecta en nuestra imaginación la cúspide que este Tribunal representa en la pirámide estructural del Poder Judicial. ¿Cuál es su connotación constitucional?

Sobre el particular, el legajo de la Asamblea Constituyente, por voz del delegado Gutiérrez Franqui, refleja:

A pesar de eso lo cierto es que la proposición traída por la Comisión de la Rama Judicial establece ciertas limitaciones que no existen ahora en la Carta Orgánica para garantizar la jurisdicción apelativa y de última instancia del Tribunal Supremo. Aquí se dispone, claramente y en palabras que no dejan lugar a dudas, que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia. Se dispone asimismo que en materia de jurisdicción el Tribunal Supremo y los demás tribunales de Puerto Rico constituirán un sistema integrado y que solamente podrá intervenir la Asamblea Legislativa en cuestiones de competencia.

Eso quiere decir que está fuera del alcance de la Asamblea Legislativa de Puerto Rico la jurisdicción del Tribunal Supremo. Lo que está a su alcance es la competencia. *Y quiere decir además, al estipular esta proposición que nosotros hemos*

*traído, que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia, que la Asamblea Legislativa no podrá impedir que los casos judiciales en alguna forma o en otra, lleguen hasta la consideración del Tribunal Supremo. Esto es lo que quiere decir que será el tribunal de última instancia.* Y cuando se dice que la Asamblea Legislativa puede reorganizar y abolir tribunales, se dice en forma no incompatible con las disposiciones de esta constitución; *que quiere decir que lo que haga nunca podrá privar al Tribunal Supremo de su condición de tribunal de última instancia.* (Énfasis suplido.) 1 Diario de Sesiones de la Asamblea Constituyente 591–592 (1961).

Esta cita plantea las siguientes interrogantes: ¿puede la Asamblea Legislativa privar a un litigante del acceso al Tribunal Supremo, como foro apelativo de última instancia? ¿Significa ello que cualquier persona afectada por un dictamen de un tribunal de primera instancia o intermedio apelativo tiene derecho a reclamar nuestra intervención discrecional, independientemente de que su planteamiento conlleve una cuestión constitucional sustancial? Las respuestas son importantes, pues una vez un litigante toca a nuestras puertas, estamos realmente ante una "doble apelación", que en términos de ese y cualesquiera otros recursos —con pocas variantes— su evaluación implica los mismos detalles de esfuerzo, estudio y costo que seguimos bajo el sistema vigente. La diferencia estriba en que se habrá institucionalizado un sistema que propicia el terrible vicio de la duplicación apelativa.

Ante esta realidad constitucional, repetimos, ¿es válida la conclusión de la Comisión Asesora del Juez Presidente de que las decisiones del tribunal apelativo serán "finales e inapelables"? ¿Es posible esa limitación? ¿Puede así legislarse? Dependiendo de las respuestas subsistirá una de las grandes objeciones contra la creación del tribunal intermedio apelativo, a saber, que se "produzca un sistema de doble apelación que promueva el retraso y el encareci-

miento de la justicia". Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 70–71. L. C. Graham y A. Scalia, *Appellate Justice: A Crisis in Virginia*, 57 Virginia L. Rev. 3, 31, 46 (1971).

## B. *Premisas cuestionables*

La estructura, esquema y enfoque de la Comisión Asesora del Juez Presidente sobre el tribunal intermedio de apelaciones se basan en unas percepciones y premisas cuestionables sobre la dinámica real del Tribunal Supremo como foro colegiado. No toma en cuenta totalmente los verdaderos problemas y prioridades que legítimamente agobian el sistema de justicia puertorriqueño. Distinto a la consolidación preconizada antes en la teoría de administración judicial norteamericana, aquí el informe se aparta de la tendencia que hay desde hace unos años en Estados Unidos, manifestada por voces autorizadas que claman — como única y verdadera solución a la congestión de casos a nivel apelativo— por el establecimiento de un sistema de revisión discrecional. H. L. Dalton, *Taking the Right to Appeal (More or Less) Seriously*, 95 The Yale L.J. 62 (1985); W. H. Rehnquist, *Discurso*, Universidad de Leyes de Florida, 15 de septiembre de 1984; D. P. Lay, *A Proposal for Discretionary Review in Federal Courts of Appeals*, 34 Sw. L.J. 1151, 1157 (1981); D. H. Baker, W. D. Watkins, T. W. Tardy III, *Appellate Court Reform*, 45 Miss. L.J. 121, 146–147 (1974); I. Wilner, *Civil Appeals: Are They Useful in the Administration of Justice?*, 56 Geo. L.J. 417 (1968).

"[E]l conceder discrecionalmente el control de acceso, y no la creación de un tribunal intermedio de apelaciones, es lo que resulta en reducir el exceso de trabajo del Tribunal Supremo y le permite aumentar su gestión de hacer política pública." (Traducción nuestra.) J. A. Stookey, *Creating an Intermediate Court of Appeal: Workload and Policymaking*

*Consequences*, The Analysis of Judicial Reform, Lexington Books, 1982, págs. 153, 161.

Nuestra investigación refleja que la creación de los tribunales intermedios de apelaciones ha tenido como consecuencia que se haya ampliado la burocracia judicial. De esa madeja judicial realmente sólo han resultado usufructuarios los jueces, abogados y fiscales, pero no la ciudadanía. Todos los indicadores objetivos tienden a demostrar que con su establecimiento en Puerto Rico la solución de controversias judiciales, de por sí demoradas, continuarán atrasándose más, pero ahora a un costo mayor. "Los tribunales intermedios apelativos fueron inventados para abolir atrasos; y ahora están amenazados de convertirse en las víctimas del mal que por un tiempo desbarataron." (Traducción nuestra.) J. D. Hopkins, *The Role of an Intermediate Appellate Court*, 41 Brooklyn L. Rev. 459, 478 (1975); A. B. Rubin y G. Ganucheau, *Appellate Delay and Cost—An Ancient and Common Disease: Is it Intractable?*, 42 Md. L. Rev. 752 (1983); D. J. Meador, *Toward Orallity and Visibility in the Appellate Process*, 42 Md. L. Rev. 732 (1983); National Center for State Courts, *Volume and Delay in State Appellate Courts: Problems and Responses*, 1979; ABA, Commission on Standards of Judicial Administration, *Standards Relating to Appellate Courts*, 1977, págs. 1–2; Weisberger, *Appellate Courts: The Challenge of Inundation*, 31 Am. U.L. Rev. 237, 241 (1982); J. G. Day, *Response to Professor Parness and Mr. Reagle*, 16 Akron L. Rev. 37 (1982).

Contra ese trasfondo conceptual y pragmático, se entiende por qué el informe haya tenido que relacionar la creación del Tribunal Intermedio de Apelaciones al sistema de revisión discrecional de apelaciones civiles. Lo que no comprendemos es la conclusión de la Comisión Asesora del Juez Presidente sobre la práctica de denegar discrecionalmente un auto de revisión, que esté tan frágilmente

asentada en unas "impresiones" históricas[8] entre un segmento de la profesión de abogados, particularmente aquellos que postulan en el área de lo civil.

El asunto amerita un examen más detallado y profundo. Hace medio siglo, bajo la óptica estrictamente forense la frase fue despectivamente descrita del siguiente modo: "Frase lapidaria con que algunos Jueces castigan sin causa o motivo, la labor de un Abogado ... que deseando ayudar con su óbolo a la administración de justicia, y después de labor meritoria a la par que de buena fé, presenta su aspecto legal de cualquier asunto que cariñosamente ha estudiado; *fácil válvula de escape, a menudo usada por jueces que, cansados del trabajo excesivo que sobre sus hombros pesa, y al cual no pueden dar paso, o no deseosos de estudiar, pone fin de manera fácil a la par que sintética, a un problema legal que les fué sometido, y en vez de obviar el camino, cierran por este medio la puerta que el letrado. ...*" (Énfasis suplido.) C. Domínguez Rubio, *No Ha Lugar*, 1 (2) Rev. C. Abo. P.R. 63 (1935). Véase el análisis jurisprudencial en E. R. Bernier, *Aprobación e interpretación de las leyes en Puerto Rico*, México, Ed. Cultural, 1963, págs. 134–137.

De época más reciente sobre el particular, nuestra búsqueda arroja dos artículos y una breve referencia. M. A. Velázquez Rivera, *No Ha Lugar*, 51 Rev. Jur. U.P.R. 453–466 (1982); F. Castro Amy, *La inmoralidad del "no ha lugar"*, 46 Rev. Col. Abog. 7–14 (1985); A. R. Calderón, Jr. y D. Rivé Rivera, *Manual de Procedimientos Apelativos*, San Juan, Ed. Rev. Jur. U.I.A. P.R., 1987, págs. 1–3.

---

[8] En este sentido el criterio de la Comisión coincide *a posteriori* con el del Juez Presidente, señor Pons Núñez, quien a raíz de haber ingresado a la judicatura desde la práctica privada —eminentemente civilista— en su primer mensaje a la Duodécima Sesión Plenaria de la Conferencia Judicial, celebrada el 19 de diciembre de 1985, expuso su percepción —entre las quejas más comunes— "el inexplicado e inescrutable 'no ha lugar' del Tribunal Supremo". Conferencia Judicial de 1985, *supra,* págs. 6–7.

En el primero, el Profesor Velázquez Rivera describe el origen y la trayectoria histórica desde principios de siglo de la frase judicial "no ha lugar" y su razón de ser en los *certiorari* hasta su evolución al extenderse su uso —como técnica dispositiva— a los recursos de revisión de sentencias civiles en 1958. A juicio suyo, un sector no cuantificado de la clase togada mira con "recelo y desconfianza" la práctica de denegar los recursos sin explicación. El Profesor Velázquez Rivera termina indicando que el "reconocimiento, por parte del Tribunal Supremo al considerar las solicitudes de Revisión, del hecho de que los litigantes no tienen ningún otro foro disponible al cual dirigir su petición de reparación de agravios judiciales, traerá, tal vez, una actitud de mayor cautela judicial al denegar de plano las solicitudes de Revisión". Velázquez Rivera, *op. cit.*, pág. 466.

El segundo artículo, escrito por el licenciado Castro Amy, refleja su insatisfacción total con el sistema según surge del modo en que lo tituló. Al evaluarlo notamos que el adjetivo "inmoral" no guarda correspondencia descriptiva ni científica con su contenido. El artículo consigna los argumentos clásicos que se aducen en favor de las apelaciones "obligatorias". Al profundizar en sus fundamentos percibimos que aparentemente su queja va más allá. La misma se convierte en una crítica originada en una discrepancia con las decisiones adoptadas por este Tribunal "en sus méritos" —una vez expedidos los recursos o después de haberse emitido órdenes de mostrar causa— en tres de cuatro casos.[9] De estos casos, solamente en dos solicitudes

---

[9] Estos cuatro (4) recursos usados como ejemplos merecen unos breves comentarios.

En *La Costa Sampedro* v. *La Costa Bolívar*, 112 D.P.R. 9 (1982), el Tribunal expidió dos recursos a petición de cada parte. Previo exhaustivo análisis de la prueba testifical y documental confirmamos la sentencia del foro de instancia.

En *Algarín* v. *Mulero* (R-84-177) el Tribunal, a solicitud de la demandante Margarita Algarín Arroyo, previa orden de mostrar causa dirigida al demandado

de revisióń se produjeron dictámenes de "no ha lugar". Sus autos demuestran que en el caso R-81-382 (*Carlo* v. *Carlo*) se concedió al recurrente, en dos ocasiones, oportunidad suficiente para convencernos. No lo logró. El otro, R-83-53 (*Selosse* v. *Asenco Ins. Co.*), fue evaluado conjuntamente con otros dos (R-83-54 y R-83-55).

Independientemente de la discrepancia legítima que pueda existir sobre la corrección de nuestros dictámenes,

---

Ángel Mulero Flores el 29 de junio de 1984, dictó sentencia y revocó el dictamen del foro de instancia emitido a favor del demandado Mulero Flores que desestimaba sumariamente una acción de división de comunidad de bienes alegadamente surgida durante una relación concubinaria de veintitrés (23) años, entre las partes en la que, además, procrearon cuatro (4) hijos.

Tomamos conocimiento judicial de que subsiguientemente este pleito culminó con una sentencia por estipulación, fechada 31 de octubre de 1986. En dicha sentencia se le reconoció a la demandante Algarín "una mitad de interés en la propiedad que fuera residencia de ellos, ubicada en el Bo. Sabana Abajo en Carolina tasada en $107,000.00. La de Cubuy se le reconoce el cincuenta por ciento (50%)". Civil Núm. 83-416 (G), Tribunal Superior, Sala de Carolina.

En los casos de *Selosse* v. *Asenco Ins. Co., etc.* (R-83-53, R-83-54 y R-83-55), todas las partes recurrieron. En el R-83-54, el Tribunal por mediación de una sala especial creada por razón de la inhibición y no intervención de varios de sus jueces, previa orden de mostrar causa, dictó sentencia y modificó la de instancia. Exoneró de responsabilidad a la recurrente American basado en que en su comparecencia Selosse no había mostrado causa, y además, que había cursado notificación tardía a American, quien como aseguradora, experimentó perjuicios sustanciales.

En el R-83-53 (Selosse fue el recurrente) el Tribunal mediante "no ha lugar" sostuvo la negativa del foro de instancia a reconocer $25,000 en concepto de daños por alegado vandalismo y hurto a un avión, como también la no imposición de honorarios e intereses por temeridad a los codemandados.

En el R-83-54, a solicitud de Pedro A. Rodríguez y Avenco Ins. Co., el Tribunal —luego de una orden de mostrar causa— modificó y eliminó una partida de daños ascendente a $9,500 por concepto de la diferencia entre el valor del avión antes del accidente y su valor en 1975.

*Carlo* v. *Carlo* (R-81-382) es el otro caso en que el Tribunal proveyó "no ha lugar" el 15 de octubre de 1981 a un recurso, que en esencia alegaba que no había existido preterición en el testamento de Miguel Carlo Rolón. Ese dictamen fue adecuadamente ponderado y analizado. Si bien el 26 de enero de 1982 nos negamos a reconsiderar, el 26 de febrero reclamamos el mandato ante una nueva reconsideración. A tal efecto concedimos a las partes término simultáneo para que nos ilustraran sobre ciertos extremos del recurso. Cumplido ese trámite, oportunamente el Tribunal se reafirmó en su dictamen inicial.

de los mismos no podemos arribar a generalizaciones y poner en entredicho todo un sistema adjudicativo que, aun con los defectos propios de toda obra humana, ha respondido hasta ahora adecuadamente a las necesidades de nuestra comunidad y clase togada.

Finalmente, en Calderón, Jr. y Rivé, *Manual de Procedimientos Apelativos, op. cit.*, los letrados consideran "alarmantes" las estadísticas sobre "no ha lugar", las cuales coinciden numéricamente con la Tabla III del Informe de la Comisión Asesora del Juez Presidente.

Ambos abogados —también de intensa práctica civilista— son del criterio de que la estructura sobre recursos civiles de revisión "ha resultado en un rotundo fracaso que requiere urgente corrección por las autoridades pertinentes". Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 1-2. En su comparecencia ante la Comisión, el licenciado Calderón endosó la instauración de un tribunal intermedio de apelaciones, pero se opuso a la consolidación del Tribunal Superior y Tribunal de Distrito.

Más allá de la percepción *bona fide* intuitiva o basada en la experiencia individual de algunos abogados o de los miembros de la Comisión Asesora del Juez Presidente, los datos empíricos recogidos en el informe no constituyen ni proveen elementos de juicio objetivos ni jurídicos suficientes para fundamentar la existencia de un problema de "injusticia" en el sistema de revisión discrecional civil. Ciertamente, en cuanto a los méritos o la frivolidad de un recurso, la matemática arroja poca luz y no es indicador serio ni sirve para reprobar y condenarlo a muerte. Al respecto, nos viene a la memoria la expresión —un tanto humorística pero imaginativa— de que las "[e]stadísticas no deben usarse del mismo modo que una persona ebria utiliza un poste de alumbrado público, para aguantarse en vez de iluminarse. Muchas veces, con los números se hace demasiado". (Traducción nuestra.) T. E. Baker, *A Compendium*

*of Proposals to Reform the United States Courts of Appeals,* XXXVII Univ. of Florida L. Rev. 225, 234 (1985).

Las estadísticas expuestas en la Tabla III y las Gráficas III, IV y V correspondientes al Tribunal Supremo —que se unen como anejos al informe— erróneamente incluyen todos los asuntos y casos (civiles, criminales, etc.) sometidos a este foro. Lamentablemente no desglosan la información pertinente al problema bajo análisis, a saber, los dictámenes sumarios de "no ha lugar" de los recursos de revisión instados contra sentencias dictadas por el Tribunal Superior y los recursos de *certiorari.* Ello impide al lector, de su faz, precisar y tener un cuadro real matemático sobre exactamente cuántos recursos contra sentencias civiles han sido negados. Al agruparse esta información con los recursos de *certiorari* el resultado es que se proyecta una estadística englobada y sobreestimada que debilita su utilidad científica y confiabilidad objetiva. La situación se agrava al percatarnos que se han mezclado las estadísticas sin distinguir si los recursos de *certiorari* son en casos civiles o criminales. Adviértase que las cifras sobre negativas a expedir en esos recursos —civiles o criminales— no pueden tomarse en cuenta para justificar el tribunal intermedio, pues sobre los *certiorari* no cabe argumentarse un "derecho de apelación".

También notamos, en cuanto al movimiento de casos ante este Tribunal, que las listas correspondientes a asuntos pendientes no especifican —como de ordinario se hace— cuántos están sometidos y cuántos están en trámite de perfeccionamiento. Ello es crucial para detectar los orígenes de la demora, la naturaleza del problema, su significado y posibles soluciones.

Con miras a esclarecer este aspecto, obtuvimos de la Oficina de Estadísticas del Tribunal el movimiento de casos desglosados por tipo de recurso y materia. Según las tablas que unimos como apéndice, en lo *civil,* durante el período

1974–75 a 1985–86, de un total de 6,540 recursos de revisión, el Tribunal proveyó "no ha lugar" en 4,531 (69.3%) y consideró 2,009 (30.7%). En los *certiorari* civiles, de 5,493 recursos denegó 3,699 (67.3%) y consideró 1,794 (32.7%). Y finalmente, en los *certiorari* criminales, de 848 denegó 628 (74.1%) y consideró 220 (25.9%).

Repetimos, sin una monitoría científica individualizada en cuanto a los méritos de los recursos y la corrección de la negativa del Tribunal a expedir, no basta la sola magia de la matemática para concluir que el sistema es injusto y debe eliminarse.

Objetamos la hipótesis en el Informe de la Comisión Asesora del Juez Presidente —implícita en todo este argumento matemático— de que en el pasado y presente, los jueces de instancia estén incurriendo en fallos erróneos en una gran proporción. También rechazamos que este foro apelativo —en el ejercicio de su jurisdicción revisora discrecional, individual o colectivamente— haya descargado deficiente y superficialmente su encomienda y no haya considerado cabalmente, con las limitaciones inherentes en toda institución humana, los méritos intrínsecos de cada recurso.

Frente al descontento natural e individual del abogado que no logra la expedición de un auto de revisión, cabe examinar el reverso de la moneda y preguntarnos: ¿Los abogados y litigantes contrarios favorecidos por los dictámenes de "no ha lugar" comparten esa crítica? ¿Qué de los miles de abogados y recursos también así beneficiados? Evidentemente lo que hoy, para una parte y su abogado puede serle injusto o enojoso, para el litigante contrario y su abogado representa el punto final justo, rápido y económico de todo un largo proceso. Ningún jurista experimentado puede sinceramente creer que siempre tiene la razón, menos que puede prevalecer en toda causa.

C. *El sistema de revisión discrecional equivale a un sistema de apelación sumaria en sus méritos*

Aunque no en toda su extensión, en lo esencial, el proceso de revisión discrecional —en la forma en que se desarrolla internamente en este Tribunal desde hace varios años— representa en la práctica y es equivalente a un sistema de apelación de disposición sumaria colegiada. R. L. Stern, *Appellate Practice in the U.S.*, Washington, D.C., Bureau of Nat. Affairs, 1981, págs. 19-20. Veamos.

Según el trámite vigente, distinto a la impresión prevaleciente expuesta en el Informe de la Comisión Asesora del Juez Presidente, los méritos de todos los recursos discrecionales, incluso las solicitudes de revisión, con sus respectivos memorandos, apéndices y demás anejos, son estudiados y evaluados antes de la conferencia semanal del Pleno, por: (1) un asesor jurídico del Panel Central; (2) opcionalmente por otro oficial jurídico de la oficina de cualesquiera de los jueces que así lo disponga, y (3) individual y separadamente por todos los jueces. Es por esta razón que reglamentariamente se exigen un original y copias suficientes para cada juez de todo escrito. Luego el recurso es personal y directamente informado en la conferencia plenaria por el juez a quien le fue asignado. Como ponente, éste formula una recomendación inicial, que puede ser que se deniegue el recurso, se expida, se emita una orden de mostrar causa, o se adopte cualquier otro curso de acción o trámite. En dicha etapa todos los jueces exponen —breve o extensamente— sus respectivos puntos de vista y criterios jurídicos sobre los méritos o frivolidad del recurso. En orden a esa discusión, o en aquellos casos dudosos si es necesario, se autoriza una Exposición Narrativa de la Prueba o la Transcripción de Evidencia. También se solicitan los autos originales, y cuando es menester, se ordena que se eleve la prueba documental. Si

algún magistrado desea estudiar el recurso más a fondo, se pospone su consideración para otra conferencia del Pleno. La divergencia de un sólo magistrado es suficiente para abrir más amplia y detalladamente la discusión. Cada magistrado expone su posición, y finalmente, por votación mayoritaria se adopta el acuerdo. "La conferencia es una garantía importante de colegiación y también refuerza el sentido personal de responsabilidad de cada juez." (Traducción nuestra.) P. D. Carrinton, D. J. Meador y M. Rosenberg, *Justice on Appeal*, St. Paul, Minnesota, West Publishing Co., 1976, pág. 29.

Es incorrecta, pues, la afirmación de la Comisión Asesora del Juez Presidente de que el sistema de revisión discrecional no rinde "una oportunidad real de justicia apelativa ante un tribunal colegiado". Informe de la Comisión Asesora del Juez Presidente, *supra*, pág. 60. Más que de un sistema discrecional u obligatorio, el grado de participación efectiva dependerá básicamente de la personalidad, hábitos de estudio, laboriosidad y preocupación de los miembros del Tribunal. Las impresiones y críticas de algunos abogados sobre la mecánica decisoria a través de un decreto de "no ha lugar", en su inmensa mayoría, son infundadas. Están basadas en la incomprensión del sistema. Responden más bien al desconocimiento de la intensa dinámica interna que, colegiadamente, conlleva la consideración de cada recurso por el Pleno de este Tribunal. Con pocas variantes, generalmente a través de este mecanismo —en mayor o menor grado— los méritos de los recursos discrecionales de revisión y *certiorari* reciben el estudio necesario, consideración y resultado que obtendrían uno (1), dos (2) o tres (3) años después bajo el método de apelación compulsoria.([10])

---

([10]) En cierto aspecto, la paradoja es que una apelación obligatoria —que sigue un curso rutinario y finalmente es asignada y llega a la oficina de uno de los jueces— no es objeto de este importante análisis preliminar colegiado que recibe

Bajo esta óptica, se impone una redefinición de lo que realmente es un "no ha lugar". No es, como se ha descrito, una frase "lapidaria", "inmoral" e "inescrutable". Tampoco significa "que menos de tres jueces de los siete jueces que constituyen este Tribunal estuvieron inclinados a librar el auto, y ... en forma alguna revela el criterio del Tribunal respecto a los méritos del caso que ha sido objeto de la petición". *Bartolomei v. Tribl. Superior*, 77 D.P.R. 462, 463 (1954). Todo lo contrario. La frase representa el producto destilado de un sistema de revisión discrecional, de equivalencia funcional, en lo esencial, a una apelación de disposición sumaria, en la que una mayoría de los jueces del Tribunal Supremo estiman que el resultado de la sentencia o dictamen del tribunal de instancia "en sus méritos" es jurídicamente correcto y justo, y que aun ha-biéndose incurrido en errores, los mismos no son perjudiciales ni variarían sustancialmente el resultado. Estos dictámenes, aunque lacónicos, son depurados, colegiados e impregnados del debate y choque de ideas y visiones pluralistas. Todos los recursos son objeto de un intenso escrutinio judicial individual y colegiado de sus méritos sobre un material básico.

Mediante la expedición de recursos meritorios, el sistema permite la corrección de errores sustanciales y, en lo verdaderamente trascendental, pautar doctrinas y establecer política pública judicial.

Además, es cuestionable que aun después de expedir y resolver el caso —por sentencia no publicada,([11]) *per curiam*

---

una revisión. Es en las apelaciones compulsorias donde la llamada dictadura del juez ponente —que tanto ha preocupado a juristas y abogados— realmente pudiera manifestarse si no hubiera una participación activa y crítica de los demás jueces.

([11]) "No existe una buena razón por qué deba publicarse en las recopilaciones de decisiones una frase secreta, oración, párrafo o corto memorando que adecuadamente explique a las partes la decisión de la corte. La no publicación

u opinión firmada— se logre evitar que subsista en algunos abogados o litigantes la insatisfacción a que se refiere la Comisión Asesora del Juez Presidente. Así tiende a corroborarlo el gran número de mociones de reconsideración que se presentan aun contra dictámenes explicados. En ciertos abogados la práctica reviste características de "rutina". Todo parece indicar que estamos ante un mal inherente e irremediable en la administración de la justicia apelativa. Bajo cualesquiera sistemas dispositivos (Sumario No Ha Lugar; explicado o no; o resuelto previa expedición), subsiste una inconformidad forense o de la parte perdidosa a aceptar la finalidad de los fallos.

En suma, aceptamos que la sana y edificante crítica "es un instrumento necesario y efectivo para mantener a los jueces alertas y atentos al estricto cumplimiento de sus funciones. Tal crítica es un interés legítimo que debemos proteger. Es un vehículo apropiado para producir cambios

---

economiza mucho tiempo judicial. Una opinión no publicada dirigida a las partes no necesita contener una relación de hechos. Puede ser escrita con menos formalidad y ser menos reescrita y pulida. Muchas veces puede ser redactada en varias horas o menos, mientras que una opinión a publicarse de ordinario toma varios días.

"Más aún, limitar la publicación a opiniones que contribuyen en algo a entender el derecho, ahorrará cuantiosas sumas. El ahorro de tiempo del juez, a largo plazo se traducirá en una reducción para el público en el costo de administrar la justicia. Y el publicar menos opiniones significará que abogados y bibliotecas de derecho tendrán que comprar menos libros. 'La publicación rutinaria de todas las opiniones conlleva gastos sustanciales y resulta en la publicación de muchas decisiones que son de poco interés o uso salvo para las partes concernidas. El costo total incluye no sólo la impresión, distribución y almacenamiento, sino también, un incremento rápido en los costos de investigación legal como consecuencia de tal proliferación. Cuando determinada jurisdicción llega al punto que los costos sobrepasan el valor de publicación rutinaria de todas las opiniones apelativas, deben adoptarse providencias para limitar tal publicación a aquéllas con valor de precedente'." (Traducción nuestra.) R. L. Stern, *Appellate Practice in the U.S.*, Washington, D.C., Bureau of Nat. Affairs, 1981, págs. 486–487; J. M. Jacobstein, *Some Reflections on the Control of the Publication of Appellate Court Opinions*, 27 Standford L. Rev. 791 (1975); W. L. Reynolds y W. M. Richman, *An Evaluation of Limited Publication in the United States Courts of Appeals: The Price of Reform*, 48 Univ. of Chicago L. Rev. 573 (1981).

favorables en el sistema de administración de justicia. Nuestro deber es escuchar esa crítica sin infundada sensiblería". *In re Cardona Álvarez,* 116 D.P.R. 895 (1986). Sin embargo, repetimos, no podemos olvidar que de ordinario, siempre uno de los litigantes —la parte perdidosa— quedará insatisfecho. Ello es inherente en todo sistema de adjudicación de controversias. Y claro está, contra la queja de buena fe, la mala interpretación, el fanatismo, el desagrado, la crítica apasionada, la hipérbole forense o la intransigencia, siempre faltarán razones. De poco servirán las explicaciones de un juez en su capacidad individual o a nombre del foro colegiado.

D. *La apelación de derecho promueve y aumenta las apelaciones, inclusive las frívolas*

El propio Informe de la Comisión Asesora del Juez Presidente, *supra,* pág. 56, reconoce que el sistema de apelaciones como cuestión de derecho, tiene el defecto de obligar a este Tribunal Supremo o al Tribunal Intermedio que se establezca "a entender en innumerables recursos frívolos". Nadie aquí ni en otras jurisdicciones cuestiona este constante fenómeno litigioso negativo. T. Y. Davies, *Gresham's Law Revisited: Expedited Processing Techniques and the Allocation of Appellate Resources,* 6 Just. Sys. J. 372, 374 (1981). Nuestra jurisprudencia reconoce que "[n]o todos los casos tienen méritos suficientes para ser llevados en alzada". *Colón Prieto v. Géigel,* 115 D.P.R. 232, 240 (1984). Solamente desconocemos las proporciones de los recursos frívolos. *Maldonado v. Pichardo,* 104 D.P.R. 778, 780 (1976). Ya desde *Pueblo v. Rosario,* 80 D.P.R. 318, 326–327 (1958), habíamos advertido: "En verdad es difícil imaginarse una apelación más frívola que ésta. Sin embargo, hemos creído conveniente escribir una larga opinión por lo siguiente: (1) innumerables apelaciones frívolas llegan constantemente ante nos tanto en casos civiles

como en casos criminales; y (2) los abogados y la opinión pública deben conocer la forma en que estos casos frívolos sobrecargan el calendario y entorpecen la labor de este Tribunal."

En cuanto a las causas de recursos frívolos —aparte del litigante que quiere demorar y evitar la ejecución final de una sentencia— "[m]uchos factores, claro está, afectan la predisposición a apelar: la cuantía de dinero en litigio; el costo de apelar (incluso tardanza, costos de impresión y honorarios de abogado); la actitud de las cortes de apelación hacia errores técnicos del juicio, y la proporción de litigantes, que son, en la terminología de Gallanter[, *Why the 'Haves' Come Out Ahead: Speculations on the Limits of Legal Change,* 9 Law & Socy. Rev. 95 (1974)], 'jugadores repetidores' organizados, tales como compañías de seguros, que tienen especialistas en apelaciones a tiempo completo". (Traducción nuestra.) R. A. Kagan, B. Cartwright, L. M. Friedman y S. Wheeler, *The Evolution of the Supreme Courts,* 76 Michigan L. Rev. 961, 968 n. 13 (1978); R. H. Mills, *Caseload Explosion: The Appellate Response,* 16 The John Marshall L. Rev. 1, 10 (1982). Más reciente, basta señalar que pocos días después de haber recibido el informe de su Comisión Asesora, el Juez Presidente, señor Pons Núñez —el jueves 26 de marzo de 1987— según nota de prensa,([12]) "hizo un llamado a los abogados del país para que se descontinúe la práctica de radicar casos frívolos. ... Aclaró que aunque en el más alto foro judicial puertorriqueño proliferan los casos frívolos, ese tipo de pleito frívolo también se da a nivel de otros foros judiciales".

Ante esta realidad de recursos inmeritorios bajo el sistema de revisiones discrecionales, ¿puede seriamente

---

([12]) *El Reportero,* sábado, 28 de marzo de 1987, pág. 2.

negarse que la reinstauración de las apelaciones civiles como cuestión de derecho, promoverá más recursos frívolos?

E. *El tribunal intermedio es en detrimento de las apelaciones criminales*

Aunque inintencionalmente, el Comité Asesor del Juez Presidente, en aras de salvar los intereses de los abogados y litigantes en el área de lo civil —por conducto del proyectado Tribunal Intermedio de salas de tres (3) jueces— sacrifica y limita la participación permanente de los Jueces del Tribunal Supremo en las apelaciones criminales.

Como regla general, en la actualidad estas son objeto de decisión por este Tribunal en pleno. La creación del Tribunal Intermedio con el propósito de una mayor participación colegial en lo civil nunca alcanzará a lograr —cuantitativa y cualitativamente— la participación y el proceso deliberativo de siete (7) jueces que, de paso, también se provee discrecionalmente aun bajo el sistema vigente de revisión. El Tribunal Intermedio privará a este foro de la facultad de continuar interviniendo directa y automáticamente en las apelaciones criminales. La consecuencia inmediata será eliminar la participación, deliberación y decisión de siete (7) jueces de rango constitucional, pues seremos sustituidos por tres (3) jueces del referido Tribunal de Primera Instancia. El impacto es inquietante. El desplazamiento se produce particularmente en la adjudicación de una de las áreas más sensitivas del derecho, la penal. Davies, *op. cit.*, pág. 373; Carrington, Meador y Rosenberg, *op. cit.*, págs. 56–61.

F. *El derecho de apelación civil aumentará las apelaciones y demorará la solución final de casos*

Sostenemos que el establecimiento del derecho a apelación civil aumentará sustancialmente el número de recursos apelados. No es mera intuición. Así lo indica la

mayoría de los estudios autenticados de otras jurisdicciones. W. E. Flango y N. F. Blair, *Creating an Intermediate Appellate Court: Does it Reduce the Caseload of a State's Highest Court?*, 64 Judicature 74 (1980). A corto plazo bajan las radicaciones del Tribunal Supremo, pero a largo plazo se evidencia un desplazamiento y congestión hacia el Tribunal Intermedio, luego al Tribunal Supremo, atrasándose más la solución final de los casos. Comienza entonces el temible círculo vicioso de congestión y atrasos,[13] que se reproduce y eventualmente se eleva en espiral a proporciones alarmantes. P. A. Talmage, *Toward*

---

[13] En nuestro medio ambiente procesal los únicos datos comparables son los que surgen de la limitada experiencia habida, en lo penal, durante el tiempo en que funcionó la División de Apelaciones:

TIEMPO QUE TARDARON EN RESOLVERSE
LOS CASOS DE LA DIVISIÓN DE APELACIONES

AÑOS FISCALES 1974–75 AL 1978–79

| Detalle | Cantidad | Total |
|---|---|---|
| Menos de 6 meses | 46 | 25.3 |
| 6 meses a 1 año | 41 | 22.5 |
| 1 año a 1 año y 6 meses | 40 | 22.0 |
| 1 año y 6 meses a 2 años | 30 | 16.5 |
| 2 a 3 años | 11 | 6.0 |
| 3 a 4 años | 12 | 6.6 |
| 4 años o más | 2 | 1.1 |
| TOTAL | 182 | 100.0 |

TIEMPO PROMEDIO Y MEDIANA

| Tiempo | 78344 |
|---|---|
| Promedio | 430 |
| Mediana | 362 |

Fuente de Información: Oficina de Estadísticas, Tribunal Supremo.

*a Reduction of Washington Appellate Court Case Loads and More Effective Use of Appellate Court Resources*, 21 Gonz. L. Rev. 21 (1985); Rosellini, *Crisis in the Supreme Court*, 3 Gonz. L. Rev. 8 (1968).

Por irreal y contrario a la dinámica y sicogénesis forense, rechazamos la visión expuesta en el Informe de la Comisión Asesora del Juez Presidente, de que la consolidación de los Tribunales Superior y de Distrito mejorará la justicia a tal grado, que aumentará la confianza del pueblo, y ello a su vez, reducirá el número de apelaciones. Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 66–67. Creemos que es utópica. En contrario sometemos la hipótesis general comprobada de que mientras más fácil sea y exista la oportunidad —de ordinario— muchas personas convictas a cumplir cárcel, o condenadas penal o civilmente al pago de determinada suma de dinero, tratarán de lograr la revocación o modificación de esa sentencia o de atrasar su cumplimiento y ejecución, usando primero —si se le provee— el derecho de apelación al Tribunal Intermedio, y segundo, al Tribunal Supremo mediante un *certiorari*.[14]

---

[14] Otra vez, como cifras disponibles tenemos los casos en sus méritos, resueltos por la División de Apelaciones, apelados nuevamente al Tribunal Supremo durante los años fiscales 1974–75 al 1979–80. Los mismos fluctúan desde un mínimo de 15.1% hasta un máximo de 69.2%.

| Año Fiscal | Resueltos en sus méritos | Apelados nuevamente al Tribunal Supremo | % del Total |
|---|---|---|---|
| 1974–75 | 12 | | 0 |
| 1975–76 | 50 | 8 | 16.0 |
| 1976–77 | 73 | 11 | 15.1 |
| 1977–78 | 13 | 9 | 69.2 |
| 1978–79 | 11 | 3 | 27.3 |
| 1979–80 | | 1 | 0 |
| TOTAL | 148 | 32 | 21.6 |

Fuente de información: Oficina de Estadísticas, Tribunal Supremo.

El reinstalar el derecho de apelación civil recargará y congestionará a la larga el Tribunal Intermedio apelativo. Después de todo, "antes de dictar sentencia *en los méritos*, los jueces de [ese] Tribunal tienen en cada caso que estudiar detenidamente un expediente que, entre otras cosas, contiene lo siguiente: *primero*, la transcripción *completa* de los autos ante el tribunal de instancia (esto es, las alegaciones, las mociones y resoluciones interlocutorias, la sentencia, etc.); *segundo*, la transcripción de *toda* la prueba oral y documental presentada en el juicio; y *tercero*, los alegatos de ambas partes. A menudo se solicita y se celebra una vista para informar oralmente el caso. Y siempre es preciso considerar cuál debe ser la decisión en una conferencia de todos los jueces que integran el Tribunal". (Énfasis del original.) *Pueblo* v. *Rosario*, supra, pág. 327.

En Estados Unidos los estudios señalan que aproximadamente el cuarenta (40%) por ciento de los casos decididos por el Tribunal Intermedio son apelados al tribunal de última instancia. T. Marvell, *The Problems of Double Appeals*, 2 App. C. Ad. Rev. 23 (1979); S. L. Wasby, T. B. Marvell y A. B. Aikman, *Volume and Delay in State Appellate Courts: Problems and Responses*, Virginia, Nat. Center for State Courts, 1979, pág. 23.

Además, bajo la hipótesis de conceder el derecho a una apelación civil compulsoria —al decir de la Comisión Asesora del Juez Presidente— responde al deseo de que "toda persona tenga la seguridad de que su caso se ventile en apelación en los méritos". Informe de la Comisión Asesora del Juez Presidente, *supra*, pág. 9. Se ha extendido ese mismo derecho apelativo a la adjudicación de todas las controversias resueltas por un sinnúmero de administradores y múltiples foros administrativos que ejercen funciones cuasi judiciales.

Coincidimos con la Comisión en que, por su paralelismo decisorio, sería ilógico que se reconociera la apelación compulsoria a los recursos provenientes de un tribunal y no si se origina y viene contra los dictámenes de un administrador o foro administrativo en funciones cuasi judiciales. En definitiva se trata de la protección de iguales derechos. Sin embargo, ello representa un cambio radical —según veremos— de gran impacto en el calendario del proyectado Tribunal Intermedio de Apelaciones. Al presente el esquema legislativo es referir tales asuntos al foro judicial —a solicitud de la persona interesada— a través de los mecanismos "discrecionales" de revisión o *certiorari*.[15]

---

[15] Siguiendo la cronología de la colección de Leyes de Puerto Rico Anotadas (L.P.R.A.), Ed. Equity, relacionamos una lista de los asuntos —que por revisión o *certiorari*— se presentan ante el Tribunal Superior por mandato legislativo, y como medio para cuestionar las determinaciones cuasi judiciales de organismos o funcionarios administrativos: Comisión de Investigación, Procesamiento y Apelación (C.I.P.A.) (1 L.P.R.A. sec. 173); Dpto. de Justicia (3 L.P.R.A. sec. 93d); Dpto. de Recursos Naturales (3 L.P.R.A. sec. 158); Dpto. de Servicios Sociales (3 L.P.R.A. secs. 211*l*-4a(c) y 211*l*-4b); Dpto. de Asuntos al Consumidor (D.A.C.O.) (3 L.P.R.A. sec. 341p); Dpto. Servicios Contra la Adicción (3 L.P.R.A. sec. 401r); Dpto. de Recreación y Deportes (3 L.P.R.A. sec. 442q); Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P.) (3 L.P.R.A. sec. 1396); Junta Ejecutiva del Sistema de Apelaciones de Justicia Criminal (4 L.P.R.A. sec. 531*o*); Dpto. de Agricultura (5 L.P.R.A. secs. 340 y 1005b); Junta Directores de Coop. de Viviendas (5 L.P.R.A. sec. 890(D)(i)); Junta Apelaciones de la Adm. de Fomento Cooperativo (5 L.P.R.A. sec. 900(a)); Secretario de Hacienda (7 L.P.R.A. sec. 201); Secretario de Hacienda, Banco Cooperativo (7 L.P.R.A. sec. 769); Secretario de Hacienda, Banco Obrero (7 L.P.R.A. sec. 819(a)); Secretario de Hacienda, Banco de Ahorros (7 L.P.R.A. sec. 1031(b)); Secretario de Hacienda, Com. Inst. Financieras (7 L.P.R.A. sec. 2015); Secretario de Hacienda, Préstamos Hipotecarios (7 L.P.R.A. sec. 1062); Dpto. de Servicios Sociales, Director de Recaudación (8 L.P.R.A. sec. 361); Sec. Transportación y Obras Públicas (9 L.P.R.A. secs. 692 y 1553(b)); Administración de Compensaciones por Accidentes de Automóviles (A.C.A.A.) (9 L.P.R.A. sec. 2061); Sec. de Hacienda, Lic. de Negocios de Ventas de Giros (10 L.P.R.A. sec. 111m); Director D.A.C.O., Reglamento de Ventas, Uso y Exámenes de Artículos Domésticos (10 L.P.R.A. sec. 112c); Secretario Comercio, Tabaco (10 L.P.R.A. sec. 243j); Sec. de Hacienda, Ley de Inversiones (10 L.P.R.A. sec. 678); Adm. de Servicios al Consumidor (A.S.E.R.C.O.) (10 L.P.R.A. secs. 259 y 783); Sec. de Hacienda, Préstamos Personales Pequeños (10 L.P.R.A. sec. 959); Sec. de Hacienda, Agencias de Cobro (10 L.P.R.A. sec. 981s); Sec. de Hacienda, Ley Arrendamiento de Propiedad

Como resultado, estos casos son evaluados discrecionalmente y atendidos por un solo Juez Superior. El extender la apelación de derecho a las adjudicaciones cuasi judiciales de las agencias administrativas conllevaría cambiar y eliminar todo este esquema de revisión discrecional vigente y sustituirlo por uno obligatorio mediante el uso total del expediente administrativo o juicio *de novo*. Implicaría entonces la intervención de tres (3) jueces.

El flujo de asuntos judiciales provenientes de estos foros administrativos aumentaría notablemente y contribuiría irremediablemente a congestionar de inmediato el Tribunal Intermedio y atrasar la disposición final de esas controversias, anulándose así una de las virtudes que se le atribuyen a ese tipo de adjudicaciones cuasi judiciales.[16] El costo para la Rama Judicial se hace evidente con la intervención de tres (3) jueces, donde al presente actúa uno (1) solo, y su participación es discrecional.

---

Mueble (10 L.P.R.A. sec. 996*l*); Sec. del Trabajo y Recursos Humanos, Beneficios por Incapacidad (11 L.P.R.A. sec. 204); Sec. Recursos Naturales, Ley de Caza (12 L.P.R.A sec. 104(f)); Junta Calidad Ambiental (12 L.P.R.A. sec. 1134(d)(1)); Sec. Dpto. Recursos Naturales (12 L.P.R.A. sec. 1520(5)); Sec. de Hacienda (13 L.P.R.A. sec. 2251b); Sec. de Hacienda, Lotería (15 L.P.R.A. sec. 120(e)); Adm. Hípico (15 L.P.R.A. sec. 189); Ley de la Policía, Lic. Tirar al Blanco (15 L.P.R.A. sec. 377(b)); Superintendente de Elecciones, Errores en Peticiones de Inscripción Electoral (16 L.P.R.A. sec. 391q); Comisión Estatal de Elecciones (16 L.P.R.A. sec. 3016a); Oficial de Construcción (17 L.P.R.A. sec. 513); Consejo de Apelación sobre Conservación Edificios (17 L.P.R.A. sec. 613); Junta Apelaciones Sistema Inst. Pública (18 L.P.R.A. sec. 274*l*); Junta Examinadora de Optómetras (20 L.P.R.A. sec. 535); Junta Examinadora de Operadores Cinematográficos y Peritos Electricistas (20 L.P.R.A. sec. 912); Junta Planificación (23 L.P.R.A. secs. 62y, 63d); A.R.P.E. (23 L.P.R.A. secs. 71x y 72d); Junta Apelaciones de A.R.P.E. (23 L.P.R.A. sec. 72c); Sec. de Salud, Cert. de Necesidad y Conveniencia (24 L.P.R.A. sec. 334f-11); Sec. del Trabajo y Recursos Humanos (29 L.P.R.A. secs. 571, 689 y 2008); Comisión de Servicio Público (27 L.P.R.A. sec. 1266), y Sec. de Justicia (32 L.P.R.A. sec. 3087).

[16] Bastará recordar el Departamento de Asuntos del Consumidor (D.A.C.O.), que anualmente genera miles de peticiones y demandas ante los tribunales del país.

G. *La división apelativa requerirá más de tres salas y afec-
tará la certeza del precedente judicial*

Nos preocupa seriamente la suficiencia de la proyección
inicial de tres (3) Salas de Apelaciones integradas por tres
(3) jueces, que aparecen en el Informe de la Comisión
Asesora del Juez Presidente, *supra*, pág. 72.

En este aspecto —con sus limitaciones— como método
científico e instrumento de aproximación para vaticinar con
alguna exactitud los efectos en el calendario de estas tres
(3) Salas usaremos las tablas adheridas al propio informe
de la Comisión Asesora del Juez Presidente, correspon-
dientes al año fiscal 1985–86 de casos y asuntos que serían
trasladados y radicados en dichos foros. El esquema
propuesto sería el siguiente:

| | | |
|---|---|---|
| Del Tribunal Supremo (Tabla III. Excluyendo 76 asuntos de jurisdicción original del Tribunal) | | 1,580 |
| Apelaciones Criminales y Civiles del Tribunal de Distrito (Anejo XVII A) | | 470 |
| Vistas Preliminares *de Novo* (Anejo XVIII) | | 1,290 |
| | Subtotal | 3,340 |
| Revisiones Administrativas (Anejo XVI) | | 615 |
| | Gran total | 3,955 |

Si excluimos las 615 revisiones administrativas —a base
de que las salas apelativas dictaminarían simplemente "no
ha lugar" a aquellas inmeritorias, aun cuando ello de por
sí es un proceso que consumiría un tiempo valioso y

sustancial— y dividimos solamente la cifra de 3,340 casos apelados entre el número de jueces recomendados (nueve (9)) es evidente que cada uno de ellos tendría que colegiadamente emitir por escrito *371* resoluciones, sentencias u opiniones *explicadas*. Si añadimos las revisiones administrativas, y dividimos entonces entre 3,955, serán *438* ponencias. Bajo cualesquiera de estas hipótesis, la tarea visualizada es monumental y casi imposible de realizar. La experiencia indica que un Juez del Tribunal Supremo de alta productividad sólo certifica anualmente entre 125 y 132 sentencias y opiniones.

Si a esta medición añadimos el incremento natural que promoverá la instauración de la apelación, como derecho, es forzoso concluir que el número de asuntos será mayor una vez se inicie el fluir y la avalancha de casos apelados. El remedio sería uno: crear más salas apelativas. Una vez comenzada esta expansión, el peligro de ese crecimiento se perfila negativamente en dos líneas geométrico-judiciales en el ámbito doctrinario, que a la larga genera un reclamo mayor para que el Tribunal Supremo intervenga. "La existencia de cortes intermedias de apelaciones presenta unos problemas de inconsistencia vertical y horizontal para el sistema judicial. El *stare decisis* requiere que todas las cortes de instancia sigan los precedentes establecidos por el Tribunal Supremo y por cada división apelativa. Pero cada división apelativa está en libertad de ignorar o discrepar de sus iguales —y regularmente las cortes lo hacen. No existe comunicación o coordinación horizontal entre las divisiones aun dentro de sus distritos. Ninguna arteria conectora de colegiación o de rotación judicial penetra las paredes interdivisorias. Este aislamiento estructural engendra aislamiento intelectual; las cortes de apelaciones fragmentadas producen derecho fragmentado. Así, la estructura apelativa de California ha sido descrita como la 'Torre de Babel Judicial'." (Traducción nuestra.)

L. M. Friedman y G. Z. Marer, *The Appellate Divisions Are Out of Control*, 3(4) Cal. Lawyer 13 (1983).

Adviértase que precisamente la Comisión Asesora del Juez Presidente estima "paradójico que actualmente el litigante en casos civiles ante el Tribunal Superior, sección que tiene competencia sobre los casos de mayor envergadura, está en posición de desventaja frente al litigante en el Tribunal de Distrito, que tiene una oportunidad de justicia apelativa como cuestión de derecho. No obstante, en este último caso la apelación se da ante un juez del Tribunal Superior, no ante un tribunal colegiado o ante un panel de jueces que deban ponerse de acuerdo entre sí para emitir una decisión". Informe de la Comisión Asesora del Juez Presidente, *supra*, pág. 59.

Esta conclusión debe cualificarse. En cuanto a los casos originados en el Tribunal Superior —una vez explicada y esclarecida la dinámica colegiada y análisis que conlleva el ejercicio de la jurisdicción revisora discrecional por el Tribunal Supremo— es cuestionable sostener que están en posición de desventaja sobre el litigante del Tribunal de Distrito.

Y en su segunda aseveración, la Comisión pierde de vista que la Sec. 19 de la Ley de la Judicatura, 4 L.P.R.A. sec. 122, al establecer el derecho a apelar al Tribunal Superior de cualquier sentencia final del Tribunal de Distrito, en lo pertinente dispone que "[l]a vista y decisión de tales apelaciones tendrán lugar ante tres jueces del Tribunal Superior o ante uno solo de ellos", conforme la regla que promulgue este Tribunal Supremo. La Regla 4 de Apelación del Tribunal de Distrito al Tribunal Superior, en vigor desde el 15 de octubre de 1952, preceptúa que tal apelación será ante un Juez del Tribunal Superior. Sin que sea menester la creación de un tribunal intermedio permanente, nada impide que a la luz de los recursos disponibles, en el futuro, establezcamos que tales apelaciones se realicen

ante un tribunal colegiado de tres (3) jueces del Tribunal Superior.

H. *El Tribunal Intermedio atrasará el perfeccionamiento de los casos y aumentará los costos de apelación*

El derecho de apelación civil implica reconocer reglamentariamente al apelante y a la parte contraria el poder solicitar y obtener una transcripción de evidencia o una exposición narrativa de la prueba en todo caso. "Si un litigante puede perfeccionar una apelación como cuestión de derecho, necesariamente debe ser acreedor a los beneficios de todo el proceso deliberativo que ofrece el foro al cual ha llevado su apelación." (Traducción nuestra y escolio omitido.) T. Kallay, *The Dismissal of Frivolous Appeals by the California Courts of Appeals*, 54 Cal. St. B.J. 92 (1979); W. H. Erickson, *The Trial Transcript—An Unnecessary Roadblock to Expeditious Appellate Review*, 11 U. Mich. J.L. Ref. 344–358 (1978).

La experiencia demuestra que la preparación del récord en apelación en casos civiles y criminales constituye la causa más grave de dilación en el trámite apelativo. Informe al Tribunal Supremo de Puerto Rico sobre el Tribunal Superior, sometido por el Comité para el Estudio y la Evaluación del Sistema Judicial, mayo de 1965, págs. 48–54; Proyecto de Informe sobre el Sistema Judicial preparado por el Lic. Jaime B. Fuster, sometido a la Comisión sobre la Administración de la Justicia del Colegio de Abogados de Puerto Rico el 27 de enero de 1972, pág. 7.

El resultado e impacto práctico de esta tara procesal será el atraso inmediato en la solución de todas las controversias que así se apelen al Tribunal Intermedio. La experiencia y datos empíricos demuestran que no es posible perfeccionar un recurso en un término no menor que oscila entre tres (3) y nueve (9) meses. Los efectos de congestión y demora apelativa son evidentes. Véase Nuevos Enfoques a la

Administración Judicial, Secretariado de la Conferencia Judicial, 1982, págs. 166–185 y tablas en el apéndice.

Si proyectamos a largo plazo el incremento normal de apelaciones de derecho, la situación puede llegar a niveles críticos. El automatismo apelativo civil producirá inexorablemente una lentitud colectiva mayor de doce (12) meses, pero a nivel intermedio adjudicativo y con la desventaja de que no pone fin al proceso judicial.

I. *El Tribunal Intermedio no aliviará sustancialmente las labores del Tribunal Supremo*

La Comisión Asesora del Juez Presidente propone la mecánica de que el Tribunal Supremo, en el ejercicio de su discreción, revise "de oficio" el calendario de apelaciones pendientes ante la división apelativa y sus salas "para seleccionar aquellas decisiones finales del Tribunal de Primera Instancia en que entenderán porque presentan cuestiones constitucionales sustanciales o sobre otras áreas de derecho [de índole] social, económica y política para el país". Informe de la Comisión Asesora del Juez Presidente, *supra*, pág. 70.

A poco reflexionemos sobre el alcance de esta recomendación, notamos que, de facto, esto constituye el ejercicio —un tanto sofisticado y limitado— de la actual función revisora de la jurisdicción apelativa de carácter discrecional, análoga a la que rige para los recursos de revisión. Implantar esta "selección" conllevará la misma dinámica colegiada, pero doble carga de trabajo, del método que genera la evaluación de los casos bajo el sistema prevaleciente y que hemos descrito anteriormente. "También es aparente que el tiempo invertido por los jueces y abogados será considerable, y ello sin mencionar el costo extra y la tardanza en el proceso apelativo." (Traducción nuestra.) L. M. Swygert, *The Proposed National Court of*

*Appeals: A Threat to Judicial Symmetry*, 51 Ind. L.J. 327, 329 (1976).

Su mayor peligro consiste en que tiende a prejuzgar anticipadamente todo reclamo ulterior de cuestión constitucional sustancial en un área en que la doctrina jurídica rechaza ese enfoque. *Bonilla* v. *Chardón*, 118 D.P.R. 599 (1987), y casos allí citados. Además, preocupa sobremanera la novedosa visión que se intenta dar a este foro de intervenir *sua sponte* selectiva y adelantadamente en cuestiones de derecho "de índole social, económica y política para el país".

En resumen, es debatible la creación de un Tribunal Intermedio de Apelaciones y si se justifica la reinstalación del derecho a apelar en casos civiles. El mecanismo propuesto para evitar la tara de las *dobles apelaciones* — legislar que sus decisiones serán finales y firmes y no podrán apelarse al Tribunal Supremo— es de dudosa constitucionalidad. Es cuestionable que sirva para aliviar la carga del Tribunal Supremo. Por el contrario, la experiencia indica que ese foro intermedio tiende a ser un gravamen procesal y económico adicional que contribuye a retrasar la solución final de los casos y a encarecer sus costos. Hoy día se cuestiona seriamente su utilidad y efectividad.

## VI

*Otras recomendaciones*

A. *Apelación al Tribunal Intermedio Apelativo de las determinaciones de inexistencia de causa probable*

Ninguna justificación encontramos en conferir al Tribunal Intermedio de Apelaciones facultad para intervenir en las apelaciones del Ministerio Fiscal de las determinaciones de inexistencia de causa probable bajo la Regla 24(c) de Procedimiento Criminal, excepto, claro está,

como imperativo de la consolidación propuesta y la ilógica creación de una sola categoría de Jueces de Primera Instancia. Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 53-54. Dos comentarios adicionales ofrecemos al respecto.

Primero, la recomendación conlleva recargar indebidamente el uso del personal judicial. Es contraria a todo principio de economía. Donde antes intervenía un solo Juez Superior, ahora tendrían que hacerlo tres (3) jueces. Y segundo, lo cuestionable de esta participación pluralista judicial es que versará sobre un dictamen de carácter interlocutorio que, de ser positivo, ulteriormente conllevará que sea atendido y juzgado (de renunciarse al jurado) por un (1) solo juez. Este injerto a destiempo no encaja en el diseño constitucional balanceado en que se afianza el sistema procesal puertorriqueño.

## B. *Grabación de los procedimientos de vistas preliminares*

Como consecuencia de establecer esa apelación, la Comisión Asesora del Juez Presidente se ha visto forzada a proponer la grabación formal de los procedimientos en la vista preliminar. La propuesta, aunque es atractiva para los abogados criminalistas, acarrea graves problemas doctrinales y prácticos. Primeramente se aparta de la visión limitada de la vista preliminar según expuesta unánimemente por este Tribunal en *Pueblo* v. *Rodríguez Aponte,* 116 D.P.R. 653 (1985). Si las salas de tres (3) jueces actuaran a base del récord, ¿estarán sujetos a la regla general de deferencia y no intervención con la adjudicación de credibilidad del foro de instancia?

Segundo, prescindiendo de este aspecto, y asumiendo la disponibilidad y existencia de grabadoras de calidad para tal fin y el personal necesario para manejarlas —si bien la operación de grabar en sí no es tarea difícil— no podemos

olvidarnos de las complicaciones y tardanzas que surgirán después. Veamos.

Una vez se comiencen a grabar tales procedimientos, es de esperarse y razonable —lo indica la experiencia— que todo acusado rutinariamente solicitará que se le permita regrabarla y transcribirla para fines de contar con la misma y poder impugnar, si es necesario, a los testigos de cargo en el juicio en su fondo. Para esta tarea y etapa los tribunales al presente no cuentan con las facilidades técnicas y de personal suficientes y adicionales. Difícilmente en un futuro cercano lo estén. De hecho, aun bajo el sistema de apelaciones criminales vigente, los datos y estadísticas disponibles reflejan que la reproducción de la prueba oral por grabaciones —para fines de una transcripción literal de la evidencia oral o un resumen de la exposición narrativa de la prueba— es un proceso lento, tedioso y complicado. Si tomamos como muestra la experiencia ante la Secretaría de este Tribunal, la misma refleja que ese trámite consume un mínimo de tres (3) a nueve (9) meses. Si consideramos el efecto multiplicador que conllevará la grabación y reproducción de los miles de procedimientos de vista preliminar, el asunto reviste proporciones serias y un potencial de atraso de varios meses más en el encausamiento de casos criminales. ¿Puede el sistema tolerar esa demora adicional? Aparte de ello, ¿podría esa recomendación operacionalmente enmarcarse dentro de los sesenta (60) días en que de ordinario debe celebrarse la vista preliminar en alzada?

La ausencia de datos en el Informe de la Comisión Asesora del Juez Presidente, para despejar estas preocupaciones y su impacto real y práctico en todo el procesamiento de casos criminales —de por sí caracterizados por calendarios congestionados y atrasados— otra vez nos impide endosar la recomendación de que se graben los procedimientos en la vista preliminar, ello independiente-

mente de las objeciones expuestas a la consolidación de los Tribunales Superior y de Distrito, y a la creación del Tribunal Intermedio de Apelaciones.

### C. Dudas sobre la constitucionalidad de la Comisión de Disciplina Permanente y del Comité de Evaluación Judicial

La Comisión Asesora del Juez Presidente, según su propia introducción, indica que su Informe está basado en varios estudios e investigaciones bibliográficas y estadísticas de los últimos años y en los puntos de vista vertidos por varias personas de prestigio vinculadas con la judicatura, la profesión de abogado y el mundo académico.

A través de todo el Informe de la Comisión Asesora del Juez Presidente fluye un deseo —evidenciado en múltiples recomendaciones— de concederle y traspasarle al Juez Presidente facultades que por su naturaleza corresponden propiamente al Tribunal Supremo. A tal efecto, se destacan la designación de los miembros de la Comisión de Disciplina y la de los miembros del Comité de Evaluación Judicial.

Siguiendo un sistema establecido en la Constitución de California(17) —adoptado por casi todos los estados de la Unión Americana— la Comisión Asesora del Juez Presidente, recomienda:

> ... que se establezca una Comisión de Disciplina permanente, designada por el Juez Presidente, ante la cual el Procurador de Ética sostendrá los cargos en los procedimientos disciplinarios contra jueces y presentará la prueba en los casos de separación del servicio de los jueces del Tribunal de Primera Instancia y de la División Apelativa que más adelante se propone.

---

(17) En ese estado se realizó mediante enmienda constitucional. Los nombramientos de la comisión allá los hace el Tribunal Supremo y no el Juez Presidente. C.A. Laws, *Judicial Misconduct*, 11 San Fern. V. L. Rev. 43, 44 (1983).

La Comisión deberá estar adscrita al Tribunal Supremo e integrada por un ex juez de dicho Tribunal, un juez del Tribunal de Primera Instancia, un abogado y dos ciudadanos de la comunidad que no sean abogados. Los términos de nombramiento de los miembros de la Comisión serán escalonados para asegurar la continuidad de ésta. La Comisión presidirá las vistas de los procedimientos disciplinarios y de separación del servicio contra jueces y formulará recomendaciones concretas al Tribunal Supremo en cada caso. Podrá recomendar desde el archivo de los cargos hasta la destitución o separación del servicio de un juez. Los procedimientos observarán con el mayor rigor normas que garanticen a los jueces el debido procedimiento de ley. Informe de la Comisión Asesora del Juez Presidente, *supra*, págs. 24–25.

La propuesta podría otra vez tropezar con el diseño actual constitucional. Aparentemente sólo sería viable si se enmienda la Constitución y reevalúa y reformula la facultad inherente reconocida al Tribunal Supremo de reglamentar en sus múltiples aspectos a los abogados.

Según antes expusiéramos, al presente los trámites de disciplina de abogados se ventilan en el Tribunal Supremo bajo el principio de que es un asunto que compete al ejercicio de su jurisdicción original. En casos apropiados, por razones obvias, el Tribunal designa un comisionado que recibe la prueba y formula sus conclusiones. Dicha persona se constituye en los ojos y oídos del Tribunal. Cumplida su encomienda al rendirnos su informe, entonces el Tribunal, en pleno —previa oportunidad a las partes— decide.

¿Cuadra en el esquema prevaleciente constitucional la creación legislativa de una comisión de disciplina permanente? ¿Es válido que su composición sea facultad exclusiva del Juez Presidente? Es interesante notar que en este aspecto, sus prerrogativas son judiciales e idénticas a las de los Jueces Asociados. Los indicadores tienden a sostener que una comisión de este tipo solamente es permisible si es creada y nombrada por el Tribunal Supremo. Ante estas

dudas, no podemos endosar la propuesta legislación de la Comisión Asesora del Juez Presidente. Aun así, por sus méritos intrínsecos, la idea debe explorarse más profunda y científicamente para ver si puede desarrollarse, como alternativa al método existente, pero por disposición de este Tribunal.

También objetamos la premisa inarticulada en que se asienta la recomendación sobre la evaluación judicial de la Comisión Asesora del Juez Presidente. La "función judicial" de los miembros de la judicatura, no es materia exclusiva del Juez Presidente o el Administrador de los Tribunales. Los criterios que nutren este tipo de evaluación —integridad, competencia profesional y temperamento— si bien contienen ingredientes de carácter administrativo, en el fondo están revestidos y relacionados con el juez en su esfera netamente judicial. "La amplia facultad otorgada al Juez Presidente y por delegación de éste a su portavoz, el Director Administrativo, siempre exigió —tradicionalmente lograda— que quedara claramente delineada y separada la esfera de acción administrativa de ambos funcionarios, en cuanto a la función de índole judicial de los jueces. En cuanto a la adjudicación de casos, existen una autonomía y prerrogativa absolutas de los magistrados en las que los superiores jerárquicos administrativos antes mencionados no pueden intervenir directa ni indirectamente. *En otras palabras, en el descargo de sus deberes, el juez no tiene otros superiores jerárquicos que la Ley y la Justicia.*" (Énfasis suplido.) *Negrón Soto* v. *Gobernador*, supra, pág. 667. Bajo esta perspectiva, el sistema evaluativo es prerrogativa del Tribunal en pleno. ABA, *Special Committee on Evaluation of Judicial Performance*, agosto de 1985, pág. 5.

Sobre este aspecto, a la brevedad posible, merecen ponerse en vigor por el Tribunal las medidas propuestas en el Informe del Secretario de la Conferencia Judicial

sobre Inmunidad y Evaluación Judicial, noviembre de 1985, pág. 66 *et seq.*([18]) La responsabilidad judicial es una ineludible contrapartida de todo reclamo de independencia funcional.

# VII

## *Conclusiones*

El Informe de la Comisión Asesora del Juez Presidente representa un respetable esfuerzo legítimo más, aunque fraccionado, de plantear ante el país el panorama poco satisfactorio en que se encuentra en ciertas áreas nuestro sistema de justicia y la necesidad de mejorarlo.

---

([18]) En este informe se formularon las siguientes recomendaciones:

"1. El Comité de Evaluación Judicial deberá ser presidido por un Juez del Tribunal Supremo y sus miembros deberán ser jueces en servicio y ex-jueces de reconocida aptitud, integridad y experiencia.

"2. La meta principal de un sistema de evaluación debe ser el mejoramiento y desarrollo profesional de los integrantes de la judicatura.

"3. El Comité de evaluación deberá evaluar a todo juez al finalizar el término de su cargo e informar a los poderes correspondientes sobre la gestión realizada por dicho juez durante su incumbencia.

"4. La evaluación estará basada en los siguientes criterios: integridad, competencia, productividad, temperamento.

"5. El criterio de productividad deberá medirse tomando en consideración el número de casos resueltos, complejidad determinada a base del tipo de caso y tiempo que le toma resolverlo en relación con los estándares propuestos para cada tipo de caso.

"6. La evaluación deberá incluir información subjetiva recopilada a través de cuestionarios y data objetiva recopilada por la Oficina de Administración de los Tribunales.

"7. Las evaluaciones deberán llevarse a cabo dos veces durante el término de incumbencia del juez.

"8. El Comité de Evaluación deberá mantener bajo estricto control la metodología a utilizarse, la cual de primera intención deberá ser sencilla y flexible.

"9. El juez deberá tener derecho de acceso al informe pero no a las fuentes de información. El público no tendrá acceso al informe.

"10. El sistema deberá instrumentarse en un solo tribunal como plan experimental antes de establecerlo de manera definitiva." Informe del Secretariado de la Conferencia Judicial sobre Inmunidad y Evaluación Judicial, noviembre de 1985, págs. 67-69.

En algunos extremos vitales no está avalado en datos empíricos objetivos. A modo de ejemplo, creemos que el impacto económico de la consolidación de $2,250,000 está subestimado, pues no toma en cuenta costos indirectos.

El énfasis del Informe de la Comisión Asesora del Juez Presidente ha sido agilizar los casos en el área de lo civil. En lo criminal no contiene expresamente ni una sola idea o recomendación de cómo acelerar tales causas criminales en los Tribunales de Primera Instancia y ante este Tribunal Supremo. En este último extremo, coincidimos con la Comisión Asesora del Juez Presidente, de que "el examen de conciencia institucional resulta oportuno". Íd., *op. cit.*, pág. 2. La cuestión es trascendental. Hay que agilizar las causas criminales. Después de todo, la única contribución lícita del Poder Judicial en la prevención y disminución de la criminalidad es la declaración rápida de inocencia o culpabilidad de quienes son juzgados.

La creación del Tribunal Intermedio forzosamente propiciará una mayor lentitud en esta área. Afectará la finalidad de los casos criminales y adicionará otro eslabón en la lenta cadena estructural judicial vigente.

Nuestra obligación es propiciar el logro de la trilogía constitucional de un sistema "justo, rápido y económico":

A) *Proceso justo:* El axioma es el ideal de "justicia". Si bien el fallo final de un tribunal debe ser justo, este ideal debe impregnar toda la evolución procesal en sus distintas fases ... [;] B) *Proceso rápido:* Por la incertidumbre y falta de certeza que conlleva toda adjudicación tardía de una controversia, está aceptado que un sistema lento propicia injusticias. Periódicamente los jueces advertimos la existencia de ciertos escollos o factores que contribuyen a que las causas criminales sean lentas. El examen de éstos no puede ser uno limitado a la perspectiva judicial, sino uno integral que valúe y considere los impactos positivos y negativos que conllevan las normas a toda la estructura e integrantes del sistema de justicia criminal —jueces, abogados, fiscales,

testigos, peritos, perjudicados— y, sobre todo, la ciudadanía en general, último receptor y árbitro de la eficiencia en la administración de la justicia. Las reglas existentes tienen que ser realizadas concienzuda y meticulosamente, con datos empíricos completos, como uno de los medios de comenzar a afrontar responsablemente el problema.

No se necesita mucho esfuerzo mental para concluir que, si las reglas vigentes criminales disponen una serie de plazos relativamente breves en los cuales deben realizarse y procesarse determinadas gestiones —que dicho sea de paso, en la práctica no se cumplen— y, no obstante, el proceso es lento, sus causas radican en otras razones, sectores o factores ... [;] C) *Proceso económico:* Si bien esta característica corresponde al aspecto pecuniario, su examen cubre no sólo los costos de la rama judicial, sino de todos los participantes que de ordinario intervienen en el procesamiento del sistema de justicia criminal. Una clasificación sistemática comprende los siguientes aspectos: (i) *Presupuesto público:* Implica ponderar los gastos operacionales de mantener el personal de todos los componentes principales e incidentales que intervienen regularmente —jueces (Poder Judicial), fiscales (Departamento de Justicia), secretarios, alguaciles, policías y otros—; los desembolsos relacionados con los trámites y documentos ordinarios relativos a la formulación de querella, denuncia, acusación, citación, dietas, órdenes de arresto, libro de radicaciones, mociones, el presupuesto para las facilidades físicas: desde propiedad inmueble y mueble para oficina, salones de sesiones, hasta otros costos importantes, tales como luz, agua, mantenimiento, administración, etc.[;] (ii) *Al acusado:* Conlleva evaluar los gastos de defensa del caso, que puede ser mediante contratación de abogado en el ejercicio privado de la profesión o la representación gratuita por la Sociedad para Asistencia Legal[;] (iii) *A los testigos:* Presupone estudiar los costos sociales en atención a los gastos de transportación, pérdida de ingreso por ausencia del trabajo, no compensables mediante costas. (Escolios omitidos.) *Pueblo* v. *Foster,* supra, págs. 13-16.

El Informe de la Comisión Asesora del Juez Presidente, reproduce de otros estudios anteriores valiosas recomenda-

ciones que deben examinarse seria e integralmente con miras a determinar si realmente contribuirán al mejoramiento de nuestro sistema judicial. Esa tarea no se ha realizado. Debe emprenderse por este foro antes de legislativamente respaldar cualquier alteración a la estructura básica judicial.

A través de estas líneas hemos expuesto múltiples razones que nos impiden endosar el Informe de la Comisión Asesora del Juez Presidente. En lo administrativo, la consolidación de las secciones del Tribunal Superior y de Distrito impondría en la estructura judicial un esquema rígido y férreo. Su culminación tomaría mucho tiempo. La sustitución de los Jueces Municipales y Jueces de Distrito no se lograría, respectivamente, hasta principios o casi la mitad de la próxima década. El pueblo de Puerto Rico, a través de la Asamblea Legislativa, no podría reexaminarlo —ni constitucionalmente desprenderse totalmente de ese diseño y sustituirlo— hasta transcurridos, al menos, diez y seis (16) años. Económicamente la consolidación es un imán que igualaría a todos los jueces. Sin embargo, desatiende el principio elemental de jerarquía judicial. La realidad es que no todas las funciones judiciales son similares. Por ende, esa paridad funcional no es necesaria ni responde a las peculiares circunstancias de nuestra sociedad e idiosincracia. El aumento salarial sería constitucionalmente irreversible. De forma indirecta generaría reclamos de aumentos por otros funcionarios del Departamento de Justicia y miembros de la profesión de abogado afectados por la consolidación. Se desconoce el impacto monetario sobre los sistemas de retiro.

En lo judicial, la consolidación básicamente descargaría al Tribunal Superior de cierto volumen de casos y asuntos en el área de lo civil. En el procesamiento de casos

criminales y en la administración de la Ley de Menores, no habría cambios de inmediato. Se ignoran las consecuencias negativas que ello podría acarrear.

Respecto al Tribunal Intermedio de Apelaciones, en teoría de administración judicial, su concepción responde a dos propósitos, reducir la presión de casos en el Tribunal Supremo, y permitir al más alto foro dedicarse más holgadamente a la función primaria de pautar derecho y establecer política pública judicial. Aunque plausibles, la experiencia indica que ambos derroteros sólo se logran si se armonizan las labores del Tribunal Supremo y el foro intermedio y, además, se descartan las *apelaciones dobles*. Esto no ha sido posible lograrlo plenamente en ninguna jurisdicción.

La reinstalación de la apelación civil como derecho constituye un retroceso. Demostradamente, equiparar a todo litigante en una etapa post sentencia —independientemente de los méritos de su causa— ha sido el factor que ha llevado a que los tribunales intermedios apelativos y de última instancia estén sobrecargados de apelaciones frívolas. La apelación compulsoria implica que los foros apelativos no pueden dedicarle el tiempo necesario a los recursos meritorios que verdaderamente lo exigen. "Quizás el concepto más acabado de lo que debemos entender por justicia la dio el maestro Aristóteles, el Estagirita, al decir: 'Que no hay nada más injusto que igualar los desiguales.'" Citado por D. T. Cairnie Carallini, *El juez frente a la verdad y la certeza de su fallo—Único camino a seguir*, 853 Rev. Notarial 2041, 2043 (1980).

Las críticas al sistema de revisión discrecional civil no están apoyadas en estudios objetivos. Simples matemáticas no bastan para sostener un problema de *injusticia a nivel apelativo*. Las quejas corresponden más bien a las experiencias naturales de abogados litigantes, en particular aquellos que han representado a las partes perdidosas. Aunque

comprensibles, no deben servir de único fundamento para eliminar un sistema que, en términos generales, ha funcionado bien. Después de todo, para quien triunfa con un "no ha lugar", procesalmente el mecanismo propicia una solución justa, rápida y económica de su caso. Tales dictámenes son el producto colegiado de un análisis ponderado y reflexivo. "Esa labor, en su aspecto cuantitativo y en su exigencia de calidad, apenas trasciende al público. En verdad pocos abogados la conocen. En los tomos de decisiones sólo se publican nuestras opiniones." (Cita omitida.) *Pueblo* v. *Rosario*, supra, pág. 328.

Por otro lado, los argumentos a favor y en contra de los Tribunales Intermedios Apelativos —según expuestos por Leflar— son los siguientes:

> ... Como ventaja principal, señala que son el mejor método para tratar con calendarios congestionados. Pueden reducir significativamente las apelaciones en que tiene que intervenir la corte de última instancia y concurrentemente hacer que las apelaciones estén más disponibles en un número mayor de casos. Inicialmente, al menos, los tribunales intermedios pueden rendir una decisión en menos tiempo que la corte suprema cuando hay una sola apelación para un caso. Otras ventajas, tales como reducción de viajes cuando las cortes funcionan en distritos y apelaciones menos costosas, benefician al litigante más que a las cortes. La desventaja básica, arguye Leflar, es el aumento en costo para aquellos litigantes que requieren una segunda apelación. Respecto a demoras, el transcurso de tiempo entre el inicio y final de las apelaciones puede aumentar, particularmente, en casos de doble apelación. Los gastos para los contribuyentes también aumentan. Más aún, la certeza del precedente queda minado. Finalmente, se dice que la calidad del personal judicial disminuye. (Traducción nuestra.) Wasby, Marvell y Aitman, *op. cit.*, pág. 52.

Nuestro análisis revela que el inventario final de estos foros no es favorable. "[L]a creación de cortes intermedias unidas a las apelaciones discrecionales a la Corte Suprema

no han solucionado el problema de congestión en las cortes de última instancia." R. S. Brown, *Allocation of Cases in A Two-Tiered Appellate Structures: The Wisconsin Experience and Beyond,* 68 Marq. L. Rev. 189, 235 (1985).

Se ha dicho que la "creación de nuevos tribunales parece que promueve la presentación de casos nuevos. '[L]os sistemas de las cortes son como las autopistas, mientras más se construyen, mayor es el tránsito vehicular'". Flango y Blair, *op. cit.,* pág. 77. En este sentido debemos evitar que el remedio sea peor que la enfermedad. Irónicamente, en otras jurisdicciones la burocratización de los procesos judiciales ha sido el resultado de reformas bien intencionadas como la propuesta por la Comisión Asesora del Juez Presidente, diseñadas teóricamente para hacer justicia rápida y económica.

Sin prejuzgarlas, hemos planteado nuestra preocupación de si, bajo el Art. V de la Constitución, las recomendaciones principales referentes a los nombramientos de jueces, la consolidación del Tribunal Superior y de Distrito y la creación del Tribunal Intermedio —en sus fases cruciales— son constitucionalmente válidas. Debe debatirse si pueden implantarse legislativamente. De subsistir esas dudas e insistirse en los cambios estructurales, el camino más seguro y responsable es referirlas al trámite de enmiendas a la Constitución mediante referéndum o a una Convención Constituyente.

Otras propuestas de la Comisión Asesora del Juez Presidente presentan obstáculos administrativos y de otros géneros que desvirtúan o debilitan su efectividad. En suma, todas merecen cuidadosa reflexión por este Tribunal y los Poderes Legislativo y Ejecutivo antes de apoyarlas.

Para sincronizar el reloj de la administración de justicia a nuestro tiempo es menester conocer profundamente la "funcionalidad de los tribunales". Aunque se impone el examen de sus características externas y estructurales, es

imprescindible iluminarnos a través del estudio objetivo y empírico. Para evitar las improvisaciones, es impostergable el análisis de la dinámica interna para descubrir todos los factores humanos y físicos que condicionan el funcionamiento de los tribunales, y así detectar verdaderamente las diferencias entre la estructura formal escrita y la realmente existente. Sin acometerse objetivamente esa tarea todo puede ser en vano. Se impone el rechazo a la complacencia e inercia de prácticas rutinarias por jueces, abogados, fiscales y demás funcionarios judiciales que tienden a mermar el rendimiento y la eficiencia del sistema de justicia. Variar las estructuras sin cambiar nuestras actitudes es meramente una permuta fácil de apariencia sin sustrato ético alguno.

Para finiquitar, por su aplicabilidad reproducimos la siguiente admonición consignada en el Prefacio del Informe de la Comisión para el Estudio de los Tribunales del Consejo sobre la Reforma de la Justicia, *supra*, págs. V–VII.

El concepto de reforma del sistema de justicia implica una constante evaluación y reorientación de sus componentes, no s[ó]lo con el propósito de aumentar la efectividad técnica, sino también para estar a tono con la responsabilidad social, los cambios y evoluciones que experimenta nuestra sociedad moderna. Básicamente comprende el examen de tres factores a saber: Leyes y Reglamentos vigentes; Facilidades y Presupuesto y Prácticas y Actitudes prevalecientes.

Concebida de esa forma, es necesario recordar que la historia ha aleccionado que la política partidista no debe entremezclarse en un proceso de reforma del sistema de justicia (codificación, reformulación y revisión), a[u]n cuando es de rigor reconocer que inevitablemente, en alguna medida, la política puede afectar las labores al respecto.

Sin embargo, la definición de problemas y posibles recomendaciones en las diversas áreas de la justicia, son de gran trascendencia para que estén sujetas a la obtención de una ventaja política estrecha. Las ganancias efímeras políticas

no son comparables a la necesidad y a los valores envueltos de una verdadera reforma.

Si bien el debate y discusión de lo expuesto en este Informe no s[ó]lo es esperado sino deseado —como uno de los medios para reconocer y examinar los distintos y diversos puntos de vista de muchas personas capacitadas, y de esa forma llegar a decisiones balanceadas y correctas— el divorcio de la política en este debate es la única forma de lograr en Puerto Rico el fin deseado: un sistema justo, igualitario y efectivo bajo el imperio de la ley.

[Tablas al dorso]

APÉNDICE

DISPOSICIÓN INICIAL DE LOS CASOS DE REVISIONES CIVILES
PRESENTADOS ANTE EL TRIBUNAL SUPREMO

AÑOS FISCALES 1974–75 AL 1985–86

|  | 1974–75 | % | 1975–76 | % | 1976–77 | % | 1977–78 | % | 1978–79 | % | 1979–80 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Casos Presentados | 449 |  | 426 |  | 446 |  | 520 |  | 472 |  | 560 |  |
| Denegados | 300 | 66.8 | 290 | 68.1 | 319 | 71.5 | 374 | 71.9 | 330 | 69.9 | 385 | 68.8 |
| Expedidos | 149 | 33.2 | 136 | 31.9 | 127 | 28.5 | 146 | 28.1 | 142 | 30.1 | 175 | 31.2 |

|  | 1980–81 | % | 1981–82 | % | 1982–83 | % | 1983–84 | % | 1984–85 | % | 1985–86 | % | Total | Por Ciento |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Casos Presentados | 579 |  | 576 |  | 662 |  | 606 |  | 604 |  | 640 |  | 6,540 | 100.0 |
| Denegados | 396 | 68.4 | 427 | 74.1 | 422 | 63.8 | 409 | 67.5 | 396 | 65.6 | 483 | 75.5 | 4,531 | 69.3 |
| Expedidos | 183 | 31.6 | 149 | 25.9 | 240 | 36.2 | 197 | 32.5 | 208 | 34.4 | 157 | 24.5 | 2,009 | 30.7 |

APÉNDICE (Cont.)

DISPOSICIÓN INICIAL DE LOS CASOS DE *CERTIORARI* CIVILES
PRESENTADOS ANTE EL TRIBUNAL SUPREMO

AÑOS FISCALES 1974–75 AL 1985–86

| | 1974–75 | % | 1975–76 | % | 1976–77 | % | 1977–78 | % | 1978–79 | % | 1979–80 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Casos Presentados | 390 | | 351 | | 322 | | 309 | | 359 | | 435 | |
| Denegados | 263 | 67.4 | 222 | 63.2 | 213 | 66.1 | 205 | 66.3 | 259 | 72.1 | 283 | 65.1 |
| Expedidos | 127 | 32.6 | 129 | 36.8 | 109 | 33.9 | 104 | 33.7 | 100 | 27.9 | 152 | 34.9 |

| | 1980–81 | % | 1981–82 | % | 1982–83 | % | 1983–84 | % | 1984–85 | % | 1985–86 | % | Total | Por Ciento |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Casos Presentados | 438 | | 520 | | 595 | | 597 | | 587 | | 590 | | 5,493 | 100.0 |
| Denegados | 294 | 67.1 | 367 | 70.6 | 369 | 62.0 | 393 | 65.8 | 393 | 67.0 | 438 | 74.2 | 3,699 | 67.3 |
| Expedidos | 144 | 32.9 | 153 | 29.4 | 226 | 38.0 | 204 | 34.2 | 194 | 33.0 | 152 | 25.8 | 1,794 | 32.7 |

APÉNDICE (Cont.)

DISPOSICIÓN INICIAL DE LOS CASOS DE *CERTIORARI* CRIMINAL
PRESENTADOS ANTE EL TRIBUNAL SUPREMO

AÑOS FISCALES 1974-75 AL 1985-86

| | 1974-75 | % | 1975-76 | % | 1976-77 | % | 1977-78 | % | 1978-79 | % | 1979-80 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Casos Presentados | 15 | | 80 | | 93 | | 56 | | 63 | | 65 | |
| Denegados | 6 | 40.0 | 70 | 87.5 | 80 | 86.0 | 49 | 87.5 | 53 | 84.1 | 43 | 66.1 |
| Expedidos | 9 | 60.0 | 10 | 12.5 | 13 | 14.0 | 7 | 12.5 | 10 | 15.9 | 22 | 33.9 |

| | 1980-81 | % | 1981-82 | % | 1982-83 | % | 1983-84 | % | 1984-85 | % | 1985-86 | % | Total | Por Ciento |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Casos Presentados | 68 | | 66 | | 70 | | 66 | | 102 | | 140 | | 848 | 100.0 |
| Denegados | 48 | 70.6 | 40 | 60.6 | 45 | 64.3 | 42 | 63.6 | 70 | 68.6 | 82 | 78.9 | 628 | 74.1 |
| Expedidos | 20 | 29.4 | 26 | 39.4 | 25 | 35.7 | 24 | 36.4 | 32 | 31.4 | 22 | 21.1 | 220 | 25.9 |

[Tablas continúan al dorso]

APÉNDICE (Cont.)

TIEMPO TRANSCURRIDO EN LOS CASOS DE APELACIONES CRIMINALES DESDE LA APROBACIÓN DE LA EXPOSICIÓN NARRATIVA Y TRANSCRIPCIÓN DE EVIDENCIA HASTA QUE SE RECIBE EN EL TRIBUNAL SUPREMO Y PORCENTAJE DEL TOTAL

AÑOS FISCALES 1979-80 A 1985-86

| Año Fiscal | Tiempo Transcurrido | | | | | | | | | | | Gran Total | % del Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Menos de 3 Meses | | 3 a 6 Meses | | 6 a 9 Meses | | 9 a 12 Meses | | 1 Año o más | | | | |
| | Número de Casos | % del Total | Número de Casos | % del Total | Número de Casos | % del Total | Número de Casos | % del Total | Número de Casos | % del Total | | | |
| 1979-80 | | | | | | | | | | | | | |
| E.N. | 14 | 32.6 | 14 | 32.6 | 5 | 11.6 | 5 | 11.6 | 5 | 11.6 | | 43 | 100.0 |
| T.E. | 1 | 100.0 | | | | | | | | | | 1 | 100.0 |
| 1980-81 | | | | | | | | | | | | | |
| E.N. | 11 | 16.7 | 35 | 53.0 | 10 | 15.1 | 6 | 9.1 | 4 | 6.1 | | 66 | 100.0 |
| T.E. | | | | | | | | | | | | | |
| 1981-82 | | | | | | | | | | | | | |
| E.N. | 20 | 35.1 | 24 | 42.1 | 8 | 14.0 | 3 | 5.3 | 2 | 3.5 | | 57 | 100.0 |
| T.E. | 1 | 33.3 | 2 | 66.7 | | | | | | | | 3 | 100.0 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1982-83** | | | | | | | | | | | | |
| E.N. | 23 | 42.0 | 19 | 34.5 | 8 | 14.5 | 5 | 9.0 | | | 55 | 100.0 |
| T.E. | 4 | 50.0 | 3 | 37.5 | 1 | 12.5 | | | | | 8 | 100.0 |
| **1983-84** | | | | | | | | | | | | |
| E.N. | 11 | 19.6 | 30 | 53.6 | 8 | 14.3 | 3 | 5.4 | 4 | 7.1 | 56 | 100.0 |
| T.E. | | | 4 | 80.0 | | | | | 1 | 20.0 | 5 | 100.0 |
| **1984-85** | | | | | | | | | | | | |
| E.N. | 15 | 28.8 | 31 | 59.6 | 2 | 3.8 | 3 | 5.8 | 1 | 2.0 | 52 | 100.0 |
| T.E. | 3 | 100.0 | | | | | | | | | 3 | 100.0 |
| **1985-86** | | | | | | | | | | | | |
| E.N. | 15 | 23.8 | 29 | 46.0 | 10 | 15.9 | 8 | 12.7 | 1 | 1.6 | 63 | 100.0 |
| T.E. | | | 1 | 16.7 | 3 | 50.0 | 2 | 33.3 | | | 6 | 100.0 |

Fuente de Información: Oficina de Estadísticas, Tribunal Supremo

APÉNDICE (Cont.)

TIEMPO TRANSCURRIDO EN LOS CASOS DE REVISIÓN DESDE LA APROBACIÓN DE LA EXPOSICIÓN NARRATIVA Y TRANSCRIPCIÓN DE EVIDENCIA HASTA QUE SE RECIBE EN EL TRIBUNAL SUPREMO Y PORCENTAJE DEL TOTAL

AÑOS FISCALES 1979-80 A 1985-86

| Año Fiscal | Tiempo Transcurrido | | | | | | | | | | | Gran Total | % del Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Menos de 3 Meses | | 3 a 6 Meses | | 6 a 9 Meses | | 9 a 12 Meses | | 1 Año o más | | | | |
| | Número de Casos | % del Total | Número de Casos | % del Total | Número de Casos | % del Total | Número de Casos | % del Total | Número de Casos | % del Total | | | |
| 1979-80 | | | | | | | | | | | | | |
| E.N. | 2 | 20.0 | 5 | 50.0 | | | 1 | 10.0 | 2 | 20.0 | | 10 | 100.0 |
| T.E. | | | | | 1 | 100.0 | | | | | | 1 | 100.0 |
| 1980-81 | | | | | | | | | | | | | |
| E.N. | 6 | 30.0 | 7 | 35.0 | 4 | 20.0 | 1 | 5.0 | 2 | 10.0 | | 20 | 100.0 |
| T.E. | 8 | 44.4 | 8 | 44.4 | 1 | 5.6 | 1 | 5.6 | | | | 18 | 100.0 |
| 1981-82 | | | | | | | | | | | | | |
| E.N. | 9 | 33.3 | 11 | 40.8 | 2 | 7.4 | 2 | 7.4 | 3 | 11.1 | | 27 | 100.0 |
| T.E. | 5 | 62.5 | 2 | 25.0 | | | 1 | 12.5 | | | | 8 | 100.0 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1982-83** | | | | | | | | | | | | |
| E.N. | 7 | 46.6 | 6 | 40.0 | 1 | 6.7 | 1 | 6.7 | | | 15 | 100.0 |
| T.E. | 9 | 56.3 | 5 | 31.3 | 1 | 6.2 | 1 | 6.2 | | | 16 | 100.0 |
| **1983-84** | | | | | | | | | | | | |
| E.N. | 7 | 46.6 | 6 | 40.0 | | | 1 | 6.7 | 1 | 6.7 | 15 | 100.0 |
| T.E. | 7 | 53.8 | 4 | 30.8 | 2 | 15.4 | | | | | 13 | 100.0 |
| **1984-85** | | | | | | | | | | | | |
| E.N. | 8 | 72.7 | 1 | 9.1 | 2 | 18.2 | | | | | 11 | 100.0 |
| T.E. | 5 | 62.5 | 2 | 25.0 | 1 | 12.5 | | | | | 8 | 100.0 |
| **1985-86** | | | | | | | | | | | | |
| E.N. | | | 5 | 55.6 | 1 | 11.1 | 3 | 33.3 | | | 9 | 100.0 |
| T.E. | 1 | 33.3 | 2 | 66.7 | | | | | | | 3 | 100.0 |

Fuente de Información: Oficina de Estadísticas, Tribunal Supremo

APÉNDICE (Cont.)

TIEMPO TRANSCURRIDO EN LOS CASOS DE *CERTIORARI* DESDE LA APROBACIÓN DE LA EXPOSICIÓN NARRATIVA Y TRANSCRIPCIÓN DE EVIDENCIA HASTA QUE SE RECIBE EN EL TRIBUNAL SUPREMO Y PORCENTAJE DEL TOTAL

AÑOS FISCALES 1979-80 A 1985-86

| Año Fiscal | Tiempo Transcurrido | | | | | | | | | | Gran Total | % del Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Menos de 3 Meses | | 3 a 6 Meses | | 6 a 9 Meses | | 9 a 12 Meses | | 1 Año o más | | | |
| | Número de Casos | % del Total | Número de Casos | % del Total | Número de Casos | % del Total | Número de Casos | % del Total | Número de Casos | % del Total | | |
| 1979-80 | | | | | | | | | | | | |
| E.N. | 1 | 50.0 | 1 | 50.0 | | | | | | | 2 | 100.0 |
| T.E. | | | | | 1 | 100.0 | | | | | 1 | 100.0 |
| 1980-81 | | | | | | | | | | | | |
| E.N. | 1 | 100.0 | | | | | | | | | 2 | 100.0 |
| T.E. | | | 2 | 100.0 | | | | | | | 1 | 100.0 |
| 1981-82 | | | | | | | | | | | | |
| E.N. | | | 2 | 100.0 | | | | | | | 2 | 100.0 |
| T.E. | | | | | 1 | 100.0 | | | | | 1 | 100.0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **1982–83** | | | | | | |
| E.N. | 2 | 66.7 | 1 | 33.3 | 3 | 100.0 |
| T.E. | 4 | 66.7 | 2 | 33.3 | 6 | 100.0 |
| **1983–84** | | | | | | |
| E.N. | 1 | 100.0 | | | 1 | 100.0 |
| T.E. | | | 1 | 100.0 | 1 | 100.0 |
| **1984–85** | | | | | | |
| E.N. | 2 | 66.7 | 1 | 33.3 | 3 | 100.0 |
| T.E. | | | | | | |
| **1985–86** | | | | | | |
| E.N. | | | | | | |
| T.E. | | | | | | |

Fuente de Información: Oficina de Estadísticas, Tribunal Supremo

APÉNDICE (Cont.)

TIEMPO TRANSCURRIDO EN LOS CASOS DE APELACIONES CIVILES DESDE LA APROBACIÓN DE LA EXPOSICIÓN NARRATIVA Y TRANSCRIPCIÓN DE EVIDENCIA HASTA QUE SE RECIBE EN EL TRIBUNAL SUPREMO Y PORCENTAJE DEL TOTAL

AÑOS FISCALES 1979-80 A 1985-86

| Año Fiscal | Tiempo Transcurrido | | | | | | | | | | | Gran Total | % del Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Menos de 3 Meses | | 3 a 6 Meses | | 6 a 9 Meses | | 9 a 12 Meses | | 1 Año o más | | | | |
| | Número de Casos | % del Total | Número de Casos | % del Total | Número de Casos | % del Total | Número de Casos | % del Total | Número de Casos | % del Total | | | |
| 1979-80 E.N. | 3 | 100.0 | | | | | | | | | | 3 | 100.0 |
| T.E. | | | | | | | | | | | | | |
| 1980-81 E.N. | 2 | 66.7 | | | 1 | 33.3 | | | | | | 3 | 100.0 |
| T.E. | 1 | 100.0 | | | | | | | | | | 1 | 100.0 |
| 1981-82 E.N. | 2 | 50.0 | 1 | 25.0 | 1 | 25.0 | | | | | | 4 | 100.0 |
| T.E. | | | | | | | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1982-83 | | | | | | | | |
| E.N. | 1 | 50.0 | 2 | 100.0 | | | 2 | 100.0 |
| T.E. | 1 | 50.0 | | | 1 | 50.0 | 2 | 100.0 |
| 1983-84 | | | | | | | | |
| E.N. | 1 | 100.0 | | | | | 1 | 100.0 |
| T.E. | 1 | 100.0 | | | | | 1 | 100.0 |
| 1984-85 | | | | | | | | |
| E.N. | 2 | 66.7 | 1 | 33.3 | | | 3 | 100.0 |
| T.E. | 1 | 100.0 | | | | | 1 | 100.0 |
| 1985-86 | | | | | | | | |
| E.N. | 1 | 100.0 | | | | | 1 | 100.0 |
| T.E. | | | | | | | | |

Fuente de Información: Oficina de Estadísticas, Tribunal Supremo